JUDGE ABRAMS

25 CV 02409

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

Jane Doe Esq.          Plaintiff,

                                                    COMPLAINT &
                                                    DEMAND FOR JURY TRIAL

        -against-


THE LEGAL AID SOCIETY
                        Defendant
————————————————————————x


## STATEMENT OF CLAIMS

1. Plaintiff, Jane Doe Esq. by way of this Complaint, seeks relief against the Defendant, The Legal

Aid Society ("LAS" or "Legal Aid" or "Defendant"), for violations of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e, and seeks damages to redress the injuries she has been suffering

as a result of being discriminated against on the basis of her sex (female) through the acts of;

> a. **[LAS Strict Liability] Quid Pro Quo Sexual Harassment by a LAS Senior
> Management Official**, on February 27, and March 1 2023 by way of threatening to take,
> and on March 15, and 27 2023 by way of taking, material adverse work actions against the
> Plaintiff by providing a contractually unauthorized, false, derogatory employment
> reference to a prospective employer on the March 15, 2023 and by disseminating
> contractually unauthorized, false, derogatory, confidential information about the Plaintiff
> to the prospective employer on a March 27, 2023 because she rejected and continued to
> reject his sexual advances on/from a February 27,2023 telephone call. The result of said
> adverse work actions directly altered and deprived the Plaintiff of specified contractual
> tangible job benefits unique to her employment and directly caused her severe economic
> injury by loss of a specified career advancement opportunity with the prospective
> employer, and severe and long-lasting professional reputation damage with the prospective
> employer and other employers within his voluminous industry contacts, among other
> damages.

> b. **[LAS Strict Liability] Quid Pro Quo Sexual Harassment by a LAS Senior
> Management Official**, on March 1, 2023 by way of taking a material adverse work action
> of directing a LAS supervisor, subordinate to him, not to give a pre-arranged personal
> capacity and official reference for the Plaintiff with the prospective employer because on

1

March 1, 2023 because she continued to reject his sexual advances on/from a February 27,2023 telephone call. As a result of the directive the LAS supervisor did not give the pre-arranged personal capacity and official reference for the Plaintiff. The result of said adverse work actions directly altered and deprived the Plaintiff of specified contractual tangible job benefits unique to her employment and directly caused her severe economic injury by loss of a specified career advancement opportunity with the prospective employer, among other damages.

c. [**LAS Strict Liability] Retaliation by a LAS Senior Management Official**, on March 27, 2023 with no legitimate and non retaliatory reason to do so, by way of disseminating contractually unauthorized, false, derogatory confidential information about the Plaintiff to the prospective employer on a March 27, 2023 telephone call because he learned she complained in writing on March 27, 2023 of his past and current discrimination against her to General Counsel Rosenberg. The result of said adverse work actions directly altered and deprived the Plaintiff of specified contractual tangible job benefits unique to her employment and directly caused her severe economic injury by loss of a specified career advancement opportunity with the prospective employer, and severe and long-lasting professional reputation damage with the prospective employer and other employers within his voluminous industry contacts, among other damages.

d.[**LAS Strict Liability] Creating a Hostile and Abusive Work Environment by LAS General Counsel** between February 28, and April 24, 2023 by way of continuous and concerted email and telephone conversations with the Plaintiff that were permeated with discriminatory intimidation, dishonesty, ridicule, insult, humiliation and psychological abuse, because through his emails, and over Plaintiff's repeated written protests, LAS General Counsel not only failed to stop but encouraged the LAS Senior Management Official, with a LAS documented history of discrimination against the Plaintiff, to keep threatening to take material adverse work action against the Plaintiff on March 1, 2023, and to take  material adverse work actions on March 15, 2023 by providing an unauthorized, false, derogatory employment reference to a prospective employer and , on a March 27, 2023 by disseminating contractually unauthorized, false, derogatory confidential information about the Plaintiff to the prospective employer. The combination of actions by both actors against the Plaintiff being so severe and pervasive as to  alter the conditions of the her employment and create an abusive working environment.

e.[**LAS Strict Liability] Retaliation by LAS General Counsel** on April 24, 2023 with no legitimate and non retaliatory reason to do so, by way taking a materially adverse work action that altered the Plaintiff's contracted employment right/benefit to be the sole authority of permitting "personal capacity" references of LAS staff to prospective employers, because she complained on April 21, 2023 that "she was and always has been sexually harassed by [the Las Senior Management Official]" and that "LAS is knowingly permitting [the LAS Senior Management Official] to continue to sexually harass [her] in how it handled the this [prospective employer] call matter and how it continues to handle the continued matter of [the LAS Senior Management Official] in relation to [her] job search and efforts." The result of said adverse work actions directly altered and deprived the Plaintiff of specified contractual tangible job benefits unique to her employment and directly caused the Plaintiff severe economic injury among other damages.

f. **[LAS Strict Liability] Post-employment Retaliation by General Counsel** on February 21, 2024, less than two months after the Plaintiff filed the charges contained in this complaint in the Equal Employment Opportunity Commission on December 22, 2023, and with no legitimate and non retaliatory reason to do so, and in flagrant violation of the Plaintiff's specified contractual rights, by way taking a materially adverse action of providing the Senior Management Official with digital and hard copies of specified contractually confidential, and previously non-viable/withdrawn documents of the Plaintiff's employment file and making false statements to the LAS Senior Management Official about the viability of said documents, which he repeated in his EEOC affidavit. The result of said material work actions directly caused false reputation damages to the Plaintiff, extreme fear and anxiety in professional and non-professional contexts, requiring punitive damages against The Legal Aid Society.

## PARTIES TO THIS ACTION

2. Plaintiff is an adult female who resides in Nassau County, New York. Plaintiff was a senior staff attorney in the Criminal Defense Division from November 17, 2014 to December 31, 2023.

3. Upon information and belief, The Legal Aid Society is a domestic not-for profit legal services corporation with its principal place of business located at 99 Water Street, New York, N.Y. at the time of the discriminatory acts complained of herein.

**Individuals Named In This Complaint, The Actions of Which, The Legal Aid Society Is Strictly Liable For Pursuant Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e,**

4. Senior Management Official (*herein after* "SMO") was an employee of the Legal Aid Society, a non-for-profit Legal Services organization during the Plaintiff's entire employment at LAS. At all relevant times he served at the highest level of management hierarchy, managing, and directing the entire Criminal Practice in many of its operations and representing LAS as its spokesperson in many public and legal forums. SMO held Senior Management Official Authority/Supervision over the entire Criminal Practice, including the Plaintiff, as it related to, but not limited to, the LAS Law Management System, E-Discovery Practice, Pandemic Practice, Impact Litigation, Hiring for CDP specialty units, Legislative matters LAS advocates for, and hiring/firing authority or authority to influence the ultimate decision maker for all attorney positions in the Criminal Defense Practice.

3

At all relevant times SMO was one of the Plaintiff's highest-level supervisors in the context of Title VII strict liability for LAS.

5. General Counsel Rosenberg (GC Rosenberg") is an employee of the Legal Aid Society, a non for-profit Legal Services organization, and was during the Plaintiff's entire employment at LAS. At all relevant times he is The Legal Aid Society's General Counsel (*herein after* "GC Rosenberg" ) and a member of the LAS Board of Directors. He had the authority to hire and fire criminal defense staff and otherwise greatly influence the ultimate decision maker's decision. At all relevant times GC Rosenberg was one of the Plaintiff's highest-level supervisors in the context of Title VII liability.

## JURISDICTION, VENUE AND PROCEDURAL REQUIREMENTS

6. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 to 2000e-17, for employment discrimination on the basis of sex.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of New York.

8. The Plaintiff has satisfied all the procedural prerequisites for the commencement of the instant action by timely filing a Charge of Discrimination with the Equal Opportunity Commission ("EEOC") on December 22, 2023, receiving a Notice of Right to Sue on December 30, 2024, and commencing this action within 90 days of receipt of the Notice of Right to Sue. A copy of the EEOC Email Notification and Notice of Right to Sue is annexed hereto as "Exhibit A".

## FACTUAL ALLEGATIONS FOR ALL CAUSES OF ACTION

**Plaintiff's Employment at LAS: November 14, 2014 to December 31, 2023**

9. The Plaintiff began her employment at LAS as senior felony certified staff attorney on November 17, 2014.  The Plaintiff worked as a senior felony certified staff attorney from November 2014 to May 15, 2016 in the Criminal Defense Practice of Burrough Office #1 (*hereinafter* "CDP-BO #1") and from May 16, 2016 to December 31, 2023 in Criminal Defense Practice of Burrough Office #2 (*hereinafter* "CDP-BO #2").  The Plaintiff resigned from the LAS in a written letter, dated December 22, 2023, to Twyla Carter CEO and General Counsel Scott Rosenberg (*hereinafter* "CEO Carter" and "GC Rosenberg"). In an email dated, December 27, 2023, GC Rosenberg accepted Plaintiff's letter of resignation. In a signed letter, dated March 12, 2024, CEO Carter wrote;

> "This letter will confirm that [Plaintiff] was employed by The Legal Aid Society as a Staff Attorney in the Criminal Defense Practice from November 17, 2014 until December 31, 2023. She maintained a high felony caseload and conducted many hearings and trials."

In addition to carrying a heavy felony case load, the Plaintiff mentored 30 law students in the LAS internship program during her employment at LAS. In a letter dated and signed by CEO Carter on February 3, 2023, CEO Carter wrote;

> "This letter will confirm that [Plaintiff] served as an attorney mentor in The Legal Aid Society law student internship program from the Spring of 2015 through the Fall of 2022."

The Plaintiff's Resignation Letter, dated December 22, 2023, the CEO Twyla Carter letters dated February 3, 2023 and March 12, 2024 are annexed hereto as Exhibit B.

**Plaintiff's Employment at CDP-BO#1:**

10. At the time the Plaintiff commenced her employment in CDP-BO #1 she had over two decades of practice in criminal law, family law, and one decade of practice in integrated domestic violence law (hereinafter referred to as "IDV", which encompasses clients with a combination of criminal

and family court cases involving the same parties and nexus of facts). During the time the Plaintiff was employed at CDP-BO#1 she covered criminal practice and integrated domestic violence practice.

11. The Plaintiff had two supervisors at CDP-BO #1, (*herein after* "supervisor #1" and "supervisor #2"). Supervisor #1 and Supervisor #2 had daily contacts and direct supervision over the Plaintiff's case work. Additionally, SMO was the Attorney in Charge of CDP-BO#1. SMO had hierarchical supervision over the Plaintiff for her case work in criminal and IDV practice at CDP-BO #1.

12. The Plaintiff experienced a professional, respectful and pleasant working relationship with Supervisor #1 and Supervisor #2 while employed at CDP-BO #1, and thereafter, while employed from May 16, 2016 to December 31, 2023 at Criminal Defense Practice Burrough Office #2. Supervisor #1 authored a written performance review of the Plaintiff, dated December 15, 2015 noting therein that;

> "[Plaintiff] is a very strong advocate for our clients. She prepares exhaustively for litigation. She has shown herself to be skilled at cross examination and at spotting legal issues and using them to advocate for the client's position. She is an organizer and leader in the office and mentor to the younger attorneys."

SMO reviewed the evaluation and wrote;

> "[Plaintiff] You are an asset to the office and the practice. You exemplify the client-centered practice of the Society. [SMO]"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

13. Supervisor #1 wrote a letter of recommendation for the Plaintiff on January 9, 2023 for a teaching position she was seeking. Supervisor #2 agreed verbally on phone calls and in writing, on February 28, 2023 to be a "personal capacity" reference for the Plaintiff in a position she was applying for in IDV and family court roles in other legal service providers throughout 2023. The

defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**Plaintiff's Employment at CDP-BO#2:**

14. During the Plaintiff's employment at CDP-BO #2 she had three supervisors (hereinafter Supervisor #3, Supervisor #4 and Supervisor #5). Supervisor #3 #4 and #5 had daily contacts and direct supervision over the Plaintiff case work the entire time she worked in CDP-BO #2, supervisor #5 who left LAS in 2021. The Plaintiff experienced a professional, respectful, and pleasant working relationship with Supervisors #3,#4 and #5 while employed at CDP-BO #2. Supervisor #3 and Supervisor # 4 agreed verbally and in writing to be "personal capacity references" for positions the Plaintiff was applying for in IDV, Family Court and Criminal Appellate legal services providers from January 2023 through October 2023. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**The Terms, Conditions and Benefits of the Plaintiff's Employment at LAS**

15. The terms, conditions, and benefits of the Plaintiff's Employment at LAS between **November 17, 2014 and February 5, 2023** were governed by the ALAA 2013-2014 and 2016-2019 Collective Bargaining Agreement between the Association of Legal Aid Attorneys, UAW 2325 (AFL-CIO) and the Legal Aid Society (NYC). The terms, conditions, and benefits of the Plaintiff's Employment at LAS between **February 6, 2023 and December 31, 2023** were governed pursuant to an agreement executed between LAS and the Plaintiff pursuant to section 3.4.4.4 of the LAS-ALAA Collective Bargaining Agreement, (*hereinafter* **"CBA section 3.4.4.4. agreement"**). The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

16. Relevant to the charges herein are sections 1(g), 1 (h), 6, 7 (b) and 11 of the "CBA section 3.4.4.4. agreement". These were material and tangible benefits, terms, and conditions, of the Plaintiff's employment at LAS commencing February 6, 2023. Section 11 "CBA section 3.4.4.4. agreement" permits the disclosure of these specified terms of the otherwise confidential agreement because the Plaintiff, through this action, is seeking to enforce the specified terms of the agreement on the grounds that the Defendant violated these terms through their acts of discrimination complained of in this complaint. As such they are offered as evidence and facts herein to enforce the specified terms of the "CBA section 3.4.4.4. agreement." These sections state:

(1) (g) LAS shall not interfere with [Plaintiff's] efforts to obtain employment",

(1) (h) "If a future employer contacts LAS regarding [Plaintiff's] employment, LAS will provide that employer with a neutral reference, which included only [Plaintiff's] name, positions held, and dates of employment, and nothing further".

(6) The parties agree to maintain the confidentiality of the underlying facts and circumstances concerning [the entry into this agreement].

(7) (b) LAS representatives...shall not make any statement to any person, or induce any third party to make any such statement, whether written or oral, and whether expressed as fact, opinion or otherwise, that disparages, maligns, libels or slanders [Plaintiff]).

(11). Nothing herein shall be deemed to constitute an admission of wrongdoing by [Plaintiff] LAS, or ALAA or any of the other Releases. Neither this Agreement or any of its terms may be used as an admission or introduced or offered as evidence as to any law or fact in any proceeding, suit, action, or hearing, other than an action to enforce the rights set forth in this Agreement.

17. In addition to the material tangible terms, conditions and benefits listed in sections 1(g), 1 (h), 7 (b) and 11,of the "CBA section 3.4.4.4. agreement", GC-Rosenberg set forth additional terms, conditions and benefits of employment in emails dated January 9, 2023 therein stating the following among other things,

" ...Any references from LAS staff **must be requested** in their personal capacities" ,

8

" A reference letter may state that a colleague works at LAS and how that colleague is familiar with your work."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

## SMO's History of Discrimination Against the Plaintiff [RELEVANT TO UNDERSTANDING THE CONTEXT OF THE SPECIFIED CHARGES IN THIS COMPLAINT AND NOT STATED AS CHARGES IN THIS COMPLAINT] .

18. Prior to the events subject to this complaint the Plaintiff made numerous written complaints of SMO's discriminatory behavior towards the Plaintiff as follows;

   a. March 30, 2016 to AIC-CDP (work place violence, work place bullying, and retaliation),
   b. October 16, 2016 to GC Rosenberg (workplace violence, work place bullying and retaliation),
   c. February 2018 to September 2018 to GC Rosenberg (retaliation for October 16, 2016 complaint against him, sexual harassment, sexual harassment)
   d. August – December 2019 (hostile work environment, workplace bullying, sexual harassment),

## March 30, 2016: Plaintiff's Complaint Against SMO (workplace violence, work place bullying, and retaliation),

19. On April 4, 2016 the Plaintiff gave Attorney in Charge if the Criminal Defense Practice (*herein after* "AIC-CDP") a written complaint, dated March 30, 2016, detailing SMO's discriminatory behavior towards her as follows;

   [i] failure to take any action with regard to the Plaintiff's six months of reporting discriminatory behavior of a court employee towards her,
   [ii] verbally aggressive and physically violent behavior against the Plaintiff at her office door on March 24, 2016 after she told him on March 22, 2016 that because of his failure to take action against the court employee she would file an external complaint against the court employee,
   [iii] SMO's slanderous statements to staff after his acts of violence that the Plaintiff was locked in her office and trying to harm herself.

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

20. After receiving the Plaintiff's March 30, 2016, AIC-CDP directed SMO and others to carry out a pervasive campaign of adverse work actions against the Plaintiff, including but not limited to the following,

[i] assigning SMO to investigate and prepare a report on the Plaintiff's allegations in her March 30, 2016 written complaint relating to SMO's violent behavior against the Plaintiff and SMO's failure to take action against the court employee, ie., SMO was assigned by AIC-CDP to investigate himself and write a report about the conclusions of his investigation.

[ii] a mandatory mental health referral based on SMO's allegations that the Plaintiff was in her office trying to harm herself on March 24, 2016,

[iii] requiring daily reports to SMO from Supervisor's #1 and #2 of their observations of the Plaintiff's mental health status,

[iv] heightened scrutiny of the Plaintiff's work,

[v] SMO's conducting an office wide staff meeting to openly discuss Plaintiff's complaint against the court employee with staff, and

[vi] the Plaintiff's constructive transfer to BO-CDP #2 on May 2, 2016.

**October 21, 2016: Plaintiff's Complaint Against SMO ;** (workplace violence, work place bullying and retaliation),

21. On October 21, 2016 the Plaintiff sent an email to GC Rosenberg with an attached complaint pursuant to "section VII of the Legal Aid Society's Employee Handbook", (herein after "EH-VII complaint"). Her complaint detailed the pervasive campaign of adverse work actions she faced between March 24, and May 2, 2016 by SMO and AIC-CDP in retaliation for her engagement in protected activity. The email stated the following in pertinent part;

"I have set forth in the attached document unethical conduct and conduct that violates many of the Society's policies in regard to [i] the complaint process taken of my claims of a course of Sexual Harassment and Harassment taken against me by [court employee], [ii] the

retaliation action taken against me by upper management in regard to the reporting of this work place harassment." …

"I respectfully request pursuant to paragraph #7 of section VII you appoint an independent person to investigate my claims stated herein."

The Plaintiff's  attached "EH-VII complaint" stated the following among other things about SMO;

> [page 2] "[AIC-CDP] designated [SMO] to investigate my written document [March 30, 2016 documents]. The designation was unethical …[SMO] was also the subject of my written document, exhibit A, whereby I complained of behavior on his part towards me on March 24, 2016 that violated the Society's Non-Violence Policy…  I have objected both writing on several occasions and directly to [AIC-CDP] and [SMO] on May 2, 2016 at the Water Street office that it was unethical and lacking all objectivity for [SMO] to be the investigator of my complaint against [court employee] and against him." …

> [page 3] "On March 24, 2016…[SMO] used intimidation tactics which included verbal and aggressive behavior against me in an effort to get me to take a leave of absence for mental health incompetency."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

22. On November 2, 2016 GC-Rosenberg sent the Plaintiff two emails confirming that the target of her [EH-VII complaint] was SMO and AIC-CDP and not the court employee. That email stated in pertinent part;

> [November 2, 2016 10:30am] "Dear [Plaintiff], As we discussed, this will confirm that the report referred to in your e-mail of October 21 below, which was authored by [SMO] and sent to [AIC-CDP], was shared only with [LAS- CEO] and me. You confirm that you did not submit the statement regarding [court employee] dated March 30, 2016 as a complaint under the Society's Policy Prohibiting Discrimination and Harassment, and I am confirming it is not being treated as such."

> [November 2, 2016 10:35am] " … As you know, I am looking for an outside attorney to investigate the [EH-VII compliant], and I will notify you when this has been accomplished…"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

23. LAS hired an outside law firm to investigate the Plaintiff's EH-VII complaint. From November 7, 2016 to August 4, 2017 the Plaintiff communicated and met with the attorney from the law firm in charge of investigating into the Plaintiff's EH-VII complaint, (*hereinafter* "LC"). LC confirmed in two emails to the Plaintiff the nature of the outside law firm's relationship with LAS in regard to the Plaintiff's EH-VII complaint, by stating the following among other things;

> "[March 17, 2017], "As you know [outside law firm] was engaged to represent the Legal Aid Society in connection with your complaint about Legal Aid's investigation of your allegations about [court employee]. The report we have prepared for Legal Aid Society is privileged, and because of this we are unable to send you the written report. As I have stated in the past, we made a number of recommendations to Legal Aid Society as a result of our investigation, and it is our understanding that Legal Aid Society has accepted, and is in the process of implementing all of these recommendations."

> [May 30, 2017], "I also want to remind you that LAS retained our Firm to conduct an independent investigation of the facts and to make recommendations about any steps our Firm thought that LAS should take to address any issues that our Firm found during the course of the investigation."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

24. In a letter to the Plaintiff dated July 31, 2017, on the firm's letter head, signed by LC and cc'd to GC Rosenberg, LC notified the Plaintiff that LAS would meet her demands for resolution of her EEO claims in her EH-VII complaint . LC wrote in pertinent part;

> "In an effort to resolve all outstanding issues, The Legal Aid Society is willing to place in your personnel file a document that is consistent with the substance of the three acknowledgements that are contained in your June 30, 2017 email. The Legal Aid Society will place a document in your personnel file that states:
>     1. The written report that was prepared [by SMO #1] in response to [Plaintiff's] March 30, 2016 written complaint concerning conduct relating to [court employee] is null and void.
>     2.[Plaintiff's] March 28, 2016 suspension from the Legal Aid Society is null and void.
>     3.[Plaintiff's] April 4, 2016 mandatory referral to Corporate Counseling is null and void." …

> "We are very pleased that we have made progress in resolving your concerns. As I noted when we met with you, one very consistent theme we heard during our interviews is that you are a dedicated and zealous advocate for your clients. Legal Aid Society is fortunate to have you advocating on behalf of its clients."

In August 2017 GC Rosenberg placed the aforementioned document in the Plaintiff's LAS employment file and sent her a digital version as well. As recent as July 2023 the Plaintiff confirmed first hand that the document is in her LAS employment file. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

25. In an email to the Plaintiff, dated August 30, 2017, with GC Rosenberg cc'd, LC provided a written summary of LAS actions with regard to her Firm's findings based on their investigation of the Plaintiff's EH-VII compliant and their related recommendations, as well as the actions LAS took to satisfy the Plaintiffs EEO claims. LC stated the following in pertinent part;

> "LAS has now addressed all of the concerns in you raised in your complaint. LAS has acknowledged that your transfer to [CDP-BO #2] was not related to work performance, work ethic, or work relations with clients. It has deemed null and void [SMO ] written report, your suspension of March 28, the mandatory referral to Corporate Counseling Associates... It has revised its EEO policy, trained senior managers on that policy, and is preparing training on the policy for all staff... And [SMO] has been counseled on the events that occurred. Those represent very substantial steps, and you have acknowledged they satisfy you EEO claims."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

## February 14,  2018 to October 16, 2018: Plaintiff's Complaints Against SMO (retaliation for the EH-VII complaint , sexual harassment)

26. At the conclusion of the "EH-VII Complaint" investigation against SMO and CDP-AIC the Plaintiff inquired of LC about the status of the separate "court employee" investigation she

mentioned to the Plaintiff in their May 31, 2017 meeting at her law office. In a series of emails

between the Plaintiff and LC on August 24, 2017 the following was stated in pertinent part;

> [Plaintiff] Will I be made aware of what happens with the new investigation of [court
> employee], Scott said I don't have to talk to anyone else about it since I spoke to you and
> [LC's colleague] about it."

> [LC] "As part of LAS's implementations of the recommendations in our report, LAS
> management met with [court employee]. Based on the meeting and response of [court
> employee], both we and LAS are comfortable that appropriate steps have been taken to
> address the concerns you raised."

> [Plaintiff] "I am a little thrown off by the information about [court employee]. So please bare
> with me. I have many questions and I am feeling very, very anxious by this news… 1. When
> did someone meet with him? 2. Where was the meeting? 3. Who met with him?... 5.What
> specifics of my complaint were told to him? 6. Was I identified as the person who complained?
> 7. What did he say about it? 9. Were[SMO , Supervisor #1 and Supervisor #2] told anything
> about the meeting? "

> [LC] "The details of the summer meeting with [court employee] (he was the only [court
> employee in attendance with the LAS management representative) are confidential and we
> are not able to share an additional information with you. However, I can assure you that
> both we and LAS are comfortable that your concerns have been adequately addressed."

> [Plaintiff] "This is not an acceptable answer to my inquiry about [court employee]. This
> matter has to do with my safety and your answer does not convey to me that my safety is
> being taken into account. I will take efforts to ensure my safety… And your assessments that
> his response is satisfactory to you does not alleviate my fears. It is not any of your personal
> safety at stake, it is mine."

The Plaintiff received no response to this email from LC or GC Rosenberg. The defendant has

possession of the written documents referred to in this paragraph, as such they are incorporated

herein by reference.

27. On August 29 & 30, 2017, LC sent the Plaintiff Retaliatory emails on behalf of her client

LAS therein falsely stating that the Plaintiff was previously told that SMO wanted not

communications from her. The email stated in pertinent part;

[August 29, 2017] "Legal Aid has brought to our attention that you have sent text messages to [SMO, Supervisors #1 & #2] about your concerns relating to [court employee]. Neither [SMO, Supervisors #1 & #2] will be responding to your text messages... As you know you previously been asked to stop sending [SMO] text messages. [SMO] does not wish to have any contact with you and you must accept that decision. LAS has informed me that if you continue to text [SMO] in violation of this request it will be forced to discipline you for insubordinate conduct. I sincerely hope LAS is not required to engage in such progressive discipline.

[August 30, 2017] "If you have requests that you believe are reasonably related to your safety, they should be made to [AIC-CDP]. If you have EEO-related concerns, you should bring them to the attention of the LAS Diversity Officer or the Chief Human Resources Officer, as the LAS Policy Prohibiting Discrimination and Harassment states. LAS is directing you not to communicate with [SMO] for these or any other reasons, as those communications are unwanted and constitute a form of harassment. Continued communications with [SMO] will be considered insubordination and will be treated accordingly...I expect this will be our final communication about this matter, as our investigation has concluded and our role in this matter has ended. I want to wish you the best for your career at LAS."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

28. On February 14, 2018 the Plaintiff sent GC Rosenberg an email stating in pertinent part;

"[SMO] can yell scream at me, kick my door, refuse to remove his foot when I tell him he is scaring me, make up a vicious lie to cover his violent behavior and all he gets is "counseled" by LAS. I on the other hand get threatened by [LC] that LAS will file harassment charges against me if I contact [SMO] regarding reporting matters concerning my safety as it related to [court employee]. It doesn't matter to me whether [SMO] doesn't want contact with me after finding out his report was null and void... What matters is that LAS, in violation of EEO laws, makes the retaliatory threat to me of pre-determined harassment threats on his behalf for my engagement in protected activity."

GC Rosenberg responded to the Plaintiff on February 14, 2018 in an email stating in pertinent part;

"It is not the case that our instruction to you that cease communicating with [SMO] constitutes retaliation for your engagement in protected activity. The instruction is based on [SMO] statement that direct communications from you are unwanted, not because of retaliation..."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

29. On April 26, 2018 the Plaintiff sent an email to GC Rosenberg stating in pertinent part;

> "Please take care of the condition on my employment that we have previously discussed. I do
> not want to file grievances against you and [SMO]… He has no remorse for the workplace
> violence he perpetrated on me… Having the condition exist entangles me, and fighting it
> entangles me…. I ultimately will not let it stand as is, it is unfair, unlawful, in violation of LAS
> policy, damaging to my reputation, and psychologically abusive… I am a very good employee
> to this organization and I demonstrate that through my lawyering and how I handled the
> matter internally. Please figure this out and let me have peace of mind."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

30. On April 27, 2018 GC Rosenberg responded to the Plaintiff in an email stating in pertinent
part;

> "… I know this condition about not communicating with [SMO] is painful, and thinking about
> it triggers bad memories for you. But unless he changes his position on this, there is nothing
> I or LAS management can do about it. This is not a violation of LAS policy, nor is it unlawful.
> Keep in mind that it's probably painful for [SMO] as well. This is his way of dealing with it.
> People have different ways of coping with past painful events. His way is to shut it out. Perhaps
> someday, when feelings are less raw and memories have softened, you and he will be able to
> get beyond this. But I can't force that to happen. Please don't ask that of me. At least we agree
> you are a good lawyer and a good employee."

The Plaintiff was extremely upset by the extremely discriminatory, inappropriate and abusive

content of GC Rosenberg's email. On April 27, 2016 the Plaintiff responded to GC Rosenberg's

email notifying him of SMO's historical sexual harassment of the Plaintiff since her employment

LAS and his retaliatory behavior after the conclusion of the Plaintiff's EH- VII complaint.

Pleading for GC Rosenberg to take proper action to ensure the Plaintiff's safety and professional

reputation. The Plaintiff stated in pertinent part;

> " 2. My communication that are the subject of [ SMO] request that you order me to not to
> speak to him were the texts to the three supervisors (they weren't even direct to him) asking
> them to report if [court employee] spoke about me to him or the others after I was notified
> that LAS went in August 2017 and spoke to [court employee] about their findings crediting
> the complaints in my 10 page narrative. SO not only are they business related they are EEO
> PROTECTED. He (and others) did not report about [court employee] in the past, LAS found
> fault with them for that, so it was reasonable on my part to ask them to make sure they
> reported this time…

4. The only things that are painful to [SMO] is that [i] his report was null and void, [ii] that his actions at my door were exposed, and [iii] he couldn't distract me from continually expressing to him how his violence at my door and his violent lie about me "trying to hurt myself" was bothering me tremendously. He continued to email, talk, and text me up to August 2017. As long as I wasn't harping on the events of March 2016 to when I left [CDP-BO #1] he was quite happy to communicate with me. There were several times that we could have wound up at the same place at the same time and I wouldn't go or I would ask him not to go (depending on the occasion). He knows that I cant see him in person. Adding to that I don't get involved in LAS events or positions that I sense he may be present. When someone is violent with you at work, the initial mode is survival mode. The fear gets worse over time. Please do not ever refer to me again about [SMO] pain over his barbaric and abusive actions towards me. He can shut himself off from his memories of his wrong doing to cope. That is what socio paths do. I however as the recipient of that behavior am in quite a different psychological state of pain and fear.

5. The REAL TRUTH ABOUT [SMO]: When I was in [CDP-BO] I would continually complain to [Supervisor #2] that I didn't understand [SMO's behavior] that is seemed to me when he would come to my office (almost every night after hours) that it seemed like he wanted to have sexual relations in the office and for me to initiate it. That was insanely insulting to me, that a woman in my position in life would have sex in an office no less with my boss and initiate it... I wanted [Supervisor #2] to say to him stop coming to my office. She never did. So I would say to [SMO] that we should have an "adult" discussion about all the vibes and tensions between us. (he also yelled at me a lot and we argued a lot). The whole office would say he was very focused on me. I hated that, it was embarrassing to me. Anyrate he didn't have the maturity to have an adult discussion...about a month before the door event I sent him a text stating in sum and substance to stop mixing his personal feelings for me with his supervisory relationship with me, and that I was no longer interested in having any mature discussion about our problems, just stop focusing on me. He completely disregarded my text and said he was going to come see me. I have the text still and I will send it to you if you want.

Anyrate that night at my door...he was carrying on so much yelling and appearing as if he was going to drag me physically to his office. That is why I went to close my door. I was really scared and told him "stop you are scaring me." When he placed his foot in the door to prevent me from closing it all the way I was stunned. We stared at each other (me stunned) and he was so angry at me in that stare. That's when I started to scream for him to go. He let up slowly and then told that HORRIFIC lie about me. And you know the rest from there.

I felt [SMO], like [court employee], was angry and violent with me because I didn't go along with their agenda that I engage in acts of a sexual nature with them and they both took steps to have me vanished. SO it didn't happened to me once...it was horrifically happening to me twice. For the longest time I could not accept that and struggled with why that would happen to me twice. I wanted [SMO] to say I was wrong about how I felt about what he was doing at my door, that he would never use his position to punish me for not going along with his agenda for us. There is nothing I can say now. I have accepted it was retaliatory.

> Please correct this for me...you must clear this unlawful and psychologically abusive and reputation damaging condition from my employment record (as it exists in the emails of you and [LC]). IT is not acceptable to state you can only remove the condition on his say so. IT is only your say so that counts for me, he doesn't count and I will not tolerate him having control over me, which is what I dealt with at [CDP-BO #1] and for the longest time when I came to [CDP-BO #2]. THERE IS NOTHING FOR ME TO GET BEYOND WITH HIM, THAT TIME HAS PASSED AND NEVER WILL RETURN. Free me from him."

GC Rosenberg did not respond to the email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

31. On April 30, 2018 the Plaintiff sent an email to GC Rosenberg stating in pertinent part;

> "Enclosed are the relevant documents that support that the no contact condition placed on my employment was an adverse work action requested by [SMO]and imposed by LAS in retaliation for my engagement in EEO protected activity...
> Again I will not be able to seek advancements at LAS, simply b/c I can not by physically in the same place as [SMO]. He is on a lot of interview committees, and involved with numerous Water street goings on. This unlawfully imposed condition on my employment has significant consequences for future career pursuits.
> Accordingly please remove, null and void it consistent with the law and facts stated above."

GC Rosenberg did not respond to the email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

32. Given CG Rosenberg's inaction with regard to the Plaintiff's emails, the Plaintiff sought a meeting with the LAS Chairman of the Board to discuss the matter. The Plaintiff met in person with the LAS Chairman of the Board on July 25, 2018. At that time the Plaintiff provided the LAS Chairmen of the Board with the April 27, 2018 email of GC Rosenberg. The Plaintiff explained how this email was causing her great anxiety and psychological pain because of its highly inappropriate nature, especially being authored by LAS General Counsel. The Plaintiff requested the no contact condition with SMO that LC and GC Rosenberg spoke of in a series of emails be

null and void for the reasons she presented to GC-Rosenberg in the previous emails. The LAS

Chairman of the Board stated that he would look into it.

33. On August 15, 2018 the Plaintiff wrote to the LAS Chairman of the Board and email and
stated;
> "Please indicate if I will be receiving the null & void letter requested in writing (enclosed)
> and verbally on July 25, 2018 when we met three weeks ago at your office."

On August 21, 2018 the LAS Chairman of the Board sent an email to the Plaintiff stating;

> " I have spoken to Scott and he has assured me that while you have been told not to contact
> [SMO] that does not constitute disciplinary action and your record does not reflect any
> discipline."

On August 21, 2018 the Plaintiff replied to LAS Chairman of the Board stating in pertinent
part;
> "Please be clear...Are you declining to provide the corrective action on this matter consistent
> with the legal argument and documentation I have presented. Your email does not state in
> clear terms exactly what Scott is saying, and consistent with his past writings it clearly
> contradicts what he previously put in writing.
> Additionally, did you speak with Scott about the email he sent me in April 2018 essentially
> asking me to feel sorry for [SMO] who is experiencing pain that he got caught for his
> workplace violence against me? A very psychologically abusive position for General Counsel
> to present to the victim of workplace violence....
> I don't know if [SMO] said my texts to the 3 supervisors asking them to report if [court
> employee] spoke of me post August 2017 where harassment to him. It is irrelevant to me if he
> said that, what is relevant is the libeless statements by LAS that I have harassed a colleague,
> the disciplinary, humiliating non contact adverse work action imposed on me by LAS, all on
> the say so of a man who was physically violent with me in the work place and told violent lies
> about me to cover up his own violence...lies that jeopardized my status as a parent and
> attorney...You must provide me the null and void letter."

The LAS Chairman of the Board did not respond. The defendant has possession of the written

documents referred to in this paragraph, as such they are incorporated herein by reference.

34. Having received no meaningful or lawful responses from GC Rosenberg or the LAS

Chairman of the Board the Plaintiff sent an email to SMO on September 5, 2018 stating in

pertinent part;

"Please see Scott's email below…The email is the 4[th] in a series of similarly themed emails that I am trying to get LAS to null and void for one year now… Obviously you can understand how psychologically abusive the email is to me… Since LAS has given you onesided power, the ultimate say so, please rectify this situation and make clear to LAS that they misunderstood what you said last August and that you did not ask and are in need of such a sanction against my employment for making requests of you that that incorporate yourself in my safety plan for myself, (under circumstances where it was more then reasonable for me to make said safety plan)…"

On September 13, 2018 AIC-CDP sent the Plaintiff an email stating the following,

" [Plaintiff-] [SMO] has notified us that you have recently emailed him directly last week. Specifically, you sent him and email on September 5[th] at 11:29pm and September 7[th] at 4:50pm. As you have already been told, [SMO] does not wish to be contacted by you for non-client related matters and we have instructed you that for client related matters, you are to email me. This remains our expectation, As, always I am here to discuss this with you."

On September 13, 2018 the Plaintiff sent LAS Chairman of the Board , cc'ing GC

Rosenberg, AIC-CDP and SMO, stating the following among other things,

" I am writing to you to direct your attention to [AIC-CDP's] email below and register my continued EEO objections to the hostile work environment and retaliatory harassment perpetrated against me by [GC Rosenberg], [SMO], and [AIC-CDP] consistent with the verbal and written claims I made to you at our meeting on July 25, 2018 at your office, (also attached in this email). As I expressed to you then and again today it is my hope that this matter can be resolved internally…
Consistent with all of the above and our prior discussion please provide me with the null and void letter of the four (4) specified emails so we can all move on from this unpleasant matter."

On September 13, 2018 the LAS Chairman of the Board , sent the Plaintiff an email  cc'ing

GC Rosenberg, AIC-CDP and SMO, stating the following,

"[Plaintiff] I apologize for not getting back to you sooner. This matter was previously investigated and whatever the conclusions about others it certainly did not result in any findings that you should be subject to any discipline. At the same time it was concluded that further direct communications between you and [SMO] should be avoided. That is the reason you were told not to communicate with him and of course, [SMO] will not be directly communicating with you. After there was a lengthy investigation and report this matter was concluded and I do not think it appropriate for it to be re-opened."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

35. On September 30, 2018 the Plaintiff sent an email to the LAS Chairman of the Board stating among other things,

> "…3.The four specified emails do not state that communications should be "avoided", they make findings of harassment and they place no contact sanctions on my employment. The written record by LAS in response to my consistent demand for null and void letters has evolved into varying inconsistent versions of the "genesis" of this no contact sanction on my employment…at first it was [SMO], then it was AIC-CDP & Scott, now as per your writing below it is [LC's] written recommendations based on her conclusions of her investigation…
> 4. I object to your email below on the grounds that it condones retaliatory harassment and obstruction of my Title VII investigatory rights in protected EEO activity by LAS against me…
> 5. These adverse work actions have career damaging implications in current and future contexts for me, as such it must be corrected and cease immediately pursuant to LAS EEO obligations…
> 6. Consistent with past demands please provide me with the null and void letters of the four previously specified emails."

LAS Chairman of the Board did not respond to the email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

36. On October 11, 2018 the Plaintiff referred the matter via email to the President UAW Local 2325 – Assoc. of Legal Aid Attorneys (AFl-CIO). On October 12, 2018 the President of UAw Local 2325 sent an email to the Plaintiff stating,

> "I was not able to get to this today. I will do my best to begin discussion regarding you request early next week."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

37. After not hearing back from the President of UAW local 2325, the Plaintiff sent an email to

GC Rosenberg, Allan Fox, AIC-CDP, President of UAW local 2325, LAS Chairman of the Board

and SMO #1 stating in pertinent part;

> "TO : LAS Senior Management
> Enclosed are the 5 emails that I am demanding LAS null and void on the grounds that the
> written directives/instructions, delivered to me via LAS email, authored by [LC], GC
> Rosenberg, and AIC-CDP between August 2017 and September 2018 were based on false
> claims and narratives which the written record demonstrated constituted retaliatory
> harassment, in violation of Title VII and NYS Human Rights Law, for my engagement in
> EEO protected activity in August 2017.
> ... What is most problematic is that such a directive/instruction is wholly contrary to the
> findings of the [EH-VII] investigation which concluded that [SMO ] acted in a physically
> inappropriate manner with me in the work place on [March] April 24 , 2016, and that [SMO]
> made false malicious claims about his interactions with me on  [March] April 24 , 2016 that
> lead to the onslaught of adverse work actions imposed on me by senior management. It is
> [SMO] behavior as the aggressor that is the subject of those conclusion, and it unlawful and
> downright despicable for LAS to make the aforementioned directive/instruction to me,
> which inherently restricts my career advancement at LAS and is disparaging to my
> reputation.
> If LAS has determined that [SMO] should have no direct contact with me because of his
> past bad behaviors towards me then the burden is on LAS to have him absent himself from
> work related events that I am present and positions I apply for... **However, I will not
> tolerate the method and manner in which this [EH-VII] conclusion has been
> distorted to disparage me, place career advancement restrictions on me in order to
> accomplish the discipline of [SMO].**
> I have enclosed the 5 subject emails and the supporting record for my demands. I have
> asked [President of UAW local 2325] to take over discussion and conclusion of this matter
> consistent with my demands outlined above..."

The Plaintiff did not receive any communication from ALAA or the specified LAS officials

after this email. The defendant has possession of the written documents referred to in this

paragraph, as such they are incorporated herein by reference.

38. December 2018 through March 4, 2023, when the occasion presented itself, the Plaintiff and

SMO engaged in business related communications via email and telephone, notwithstanding a

formal complaint the Plaintiff filed August 31, 2019 through January 3, 2020 against SMO for

perpetuating false rumors in August of 2019 that he had a romantic and sexual relationship with her when she worked at CDP-BO#1.

**August 31, 2019 through January 3, 2020: Plaintiff's Complaint Against SMO (hostile work environment, workplace bullying, sexual harassment),**

39. On August 31, 2019, during an arraignment shift, a CDP-BO #2 staff attorney told the Plaintiff that he had just been hired by [SMO] to a career advancing position in a LAS specialty unit. During the conversation the staff attorney also told the Plaintiff that he had heard that [SMO] and the Plaintiff had a sexual and romantic relationship when she worked in CDP-BO#1. The Plaintiff informed the staff attorney that was patently false. The staff attorney's statements greatly upset the Plaintiff. The Plaintiff sent an email to CG-Rosenberg and SMO the same day stating in pertinent part;

> "…Additionally, I am notifying you that when I came to [CDP-BO#2] in 2016 that "rumor" for why I transferred from [CDP-BO#1] was because [SMO] were "sleeping together" and that I got mad that he would not do anything about my complaints (unspecified) about [court employee]. Apparently, that is still the rumor. TO SET ALL RECORDS STRAIGHT …[SMO]AND I HAVE HAD STRICTLY PLATONIC AND CEREBRAL RELATIONS SINCE WE KNOW EACHOTHER. If something other has been presented to you by [SMO] then he was mistaken…possibly with some dreams he had. I AM VERY SERIOUS ABOUT THIS MATTER whatever management can do to correct the falsity and to prevent it from being repeated…please take steps to do so."

The Plaintiff received no response from GC-Rosenberg or H.R. in regard to the notification in the email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

40. On December 4, 2019 Plaintiff sent email to GC Rosenberg, SMO, cc'ing LAS Chairman of the Board stating among other things;

> "…I have been notifying you both of this situation for nearly four months now. THE slanderous statements and the failure to correct them creates a hostile work environment for me…LAS is required under EEO law to take corrective action with regard to Slanderous statements that effect my professional and personal reputation. I am a mother, wife AND PROFESSIONAL attorney…

[SMO's] silence on this topic and his resistance to correct this slander is now causing me anxiety and high blood pressure. HE IS THE ONLY PERSON, BESIDE ME, THAT CAN STATE IT IS NOT TRUE & I SHOULD NOT HAVE TO BE FEARFUL THAT HE HAS AND POSSIBLEY CONTINUES TO STATE AN UNTRUTH TO OTHERS ABOUT IT. PLEASE respond immediately with your intentions to comply or not comply."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

41. On December 17, 2019 GC Rosenberg sent the Plaintiff an email stating in pertinent part;

"I am in receipt of various e-mails you have sent in response to my e-mail of December 10. I can assure you that [SMO] has confirmed that you and he never had sexual relations of any kind. Neither we nor [SMO] are aware of anything [SMO] has either said or done that would lead anyone to believe otherwise.
To the extent you have made a complaint that other individuals are circulating false rumors that you and [SMO] had a sexual relationship, we will, as I have already stated, treat this complaint as one under our EEO and anti-bullying policies, and we will promptly investigate it… If you have questions about the status of any of your outstanding complaints, you may direct them to me. With regard to communications on any other issues, you are to refrain from sending communications to [SMO] unless there is a business need to do so."

The defendant has possession of the written documents referred to in this paragraph, as such

42. On January 3, 2020 LAS Employee Relations [PJ] sent an email to the Plaintiff, cc'ing LAS HR director and GC Rosenberg stating in pertinent part;

"… I'm following up on your email from last week… However, there was a sense that a separate complaint from you existed indicating that staff were currently spreading false rumors about an inappropriate relationship between you and [SMO], while he was your supervisor. If it is your belief that those rumors are currently being spread, please provide me with the names of those persons whom you believe are responsible so that we can begin an investigation."

On January 3, 2020 the Plaintiff sent a reply email to LAS Employee Relations [PJ] cc'ing LAS HR director and GC Rosenberg stating in pertinent part;

"…I am enclosing much documentation for you to review in connection with my response to your email below… In the interim the enclosed documents are more than enough to get you

started and to understand the nature of my claims against [SMO ] and [GC- Rosenberg] for their unlawful acts of

1. ongoing retaliatory harassment against me for my engagement in EEO protected activity, between March 24, 2016 to present

2. ongoing malicious and untruthful written statements about me constitute unlawful slanderous  and violation of LAS employee rights

3. [SMO ] creating an appearance of impropriety that he was having a sexual relationship with me while I was his subordinate at SICCDP

4. [GC- Rosenberg] for creating false and psychologically damaging claims that I harassed [SMO ], in an effort to shield LAS from  liability from [SMO] being physically violent with me at [CDP-BO#1] on March 24, 2016 , then after leaving my office (because I managed to shut the door and keep him away from me in his rageful state)  lying to [AIC-CDP] and [3 CDP-BO#1 staff members] that I "was having a nervous breakdown" and "locked in my office trying to hurt myself". Lying to CDP-BO #1 Supervisors #1 and #2  on March 23, 2016 … that my husband was  going to divorce me , that I text [SMO #1] at 3 am in the morning, that I was having a break down and needed to be placed out of work "for a long period of time" …

After sending this email the Plaintiff never heard back from [PJ] again. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

43. On May 28, 2020 the Plaintiff received an email from the Director of Employee Relations, [JR] stating in pertinent part;

"…I am the newly hired Director of Employee Relations in the HR Department. I am emailing you to setup a date and me for us to meet via Zoom to discuss a few matters.

In reviewing the open Employee Relations cases, I see that you submitted a claim of harassment and bullying because of rumors of an inappropriate relationship with a former supervisor. To proceed with this investigation, I will need to meet with you to obtain additional information on including the names of the individuals you believe are spreading the rumors. I know my colleague [PJ] had attempted to meet with you a few months ago, however she was not successful in her efforts to do so.

Secondly, a series of email threads have been sent to me which includes communication on between you and some of your colleagues. Reading these email threads has really lead me to be concerned. It appears to me that you are upset and frustrated. I would like to meet with you to gain your perspective on these matters and explore ways I may be able to provide you with some support."

Please keep in mind that this is not a disciplinary meeting as my intent is to first obtain the necessary information on to proceed in our investigation related to the rumors and to second, talk to you about the recent email exchanges between you and your colleagues. I am available to meet on the following dates…"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

44. On June 2, 2020 in a series of email between the Plaintiff and [JR] LAS retaliated against the Plaintiff for complaining about SMO and GC Rosenberg by using the Plaintiff's 8 month old complaint to make contact with the Plaintiff and then telling the Plaintiff that her main concern/objective is to discuss  non specified emails between the Plaintiff with non specified colleague. The Plaintiff objectively understood [JR's] tactics where designed to dissuade her from persisting with her 8 month old complaint about SMO and GC Rosenberg. The following is the email communications between the Plaintiff and  Director of Employee Relations [JR].

Plaintiff stating in pertinent part;
"…I never spoke to [PJ] in person, only in writing. I will forward you that email dialogue and correspondence. Please read everything and do not contact me again unless you have…"

Director of Employee Relations[JR] stating in pertinent part;

"… Thank you for responding to my email. As I mentioned in my initial email to you, I sense that you are upset and frustrated. I want to do what I can to address your concerns. However, in order to do that I need to meet with you. In addition, there are some concerns as it relates to email exchanges between you and your colleagues that I would like to discuss. I will be sure to read the correspondence you forward to me. However, this correspondence is not a substitute for meeting with me directly… This meeting is mandatory…"

Plaintiff stating in pertinent part;
"…Your original email states that you want to speak with me about a complaint I made 8+ months ago. Now you state you want to meet with me about emails that you do not identify to colleagues that you do not identify. I am not meeting in person with anyone at LAS about non descript claims, as it has been documented that LAS has used the meeting format to inflict violence, shouting, false claims and abuse against me. Furthermore the clandestine meetings

are not recorded and it has been documented that LAS makes false claims about what transpired at the meetings.

That being said you can send me the emails that you identify that you have some sort of issue with, identify your issue and I will respond. ... I will work with you in a fair and documented manner. However I will not continue to be abused and humiliated for my engagement in EEO protected activity ..."

Director of Employee Relations [JR] stating in pertinent part;

" ... I am not retaliating against you. I intend for this meeting be a positive and productive one where progress can be made towards addressing the concerns that we both have. I am happy to see that you are willing to work with me in a fair manner... This meeting is not optional, therefore your attendance and cooperation is expected. Please keep in mind that a failure to comply with my reasonable request for a meeting could be considered insubordination..."

Plaintiff stating in pertinent part;

"...Everything must be in writing for the reasons I have stated. If you want to make a determination on of insubordination on then do so in writing... Stop retaliating against me for my engagement in EEO protected activity. Send me your targeted emails and state your issues in writing. This process must be conducted in writing because of the significant abuses and deceptions that I have endured by the few select meetings that I attended with LAS management. Which by the way were sustained in my favor as a result of my [EH-VII] complaint against [AIC-CDP]."

"...And moreover I have several of your emails that have introduced yourself to me as investigating a work place bullying claim I made 8 months ago, only to be revealed as a corrupt email to lure me to a sabotage meeting. Such as the one [SMO] and [AIC-CDP] concocted on March 24, 2016 where [SMO] became violent with me and then concocted a coverup with [AIC-CDP] for his violence and told violent lies about me jeopardizing my status as a parent and an attorney. There is no good will on your part to meet with me and resolve anything...

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

45. The Plaintiff did not receive any communication from LAS Director of Employee Relations [JR] after this email about the investigation or the email threads with other colleagues. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

46. On August 27, 2020 LAS HR Director of Employee Relations [JR] sent the Plaintiff an email with an attachment titled "Memorandum" which stated in pertinent part;

> "On December 19, 2019 you submitted a complaint that rumors about an inappropriate relationship between you and a former supervisor have been a topic of discussion causing a Hostile Work Environment. Unfortunately, you declined to participate in the investigation. However, we did interview potential witnesses identified in the documents you submitted. We also reviewed information gathered during the investigation and we have concluded that your claim could not be substantiated…This case is officially closed."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

47. On March 1, 2023 during a text communication thread between and the Plaintiff and the Deputy Attorney in Charge of CDP-BO #1 (formerly known to Plaintiff as Supervisor #2 of CDP-BO#1) , the later revealed that SMO was extensively investigated about the Plaintiff's rumor complaint and that the "disgusting [sexual] rumors" the Plaintiff complained about were known by LAS to exist. The text communication thread stated in pertinent part;

> D-AIC: "I never understood what you saw in him. He's smart at the expense of others."
>
> Plaintiff: "When I am untangled from LAS and have other employment I can explain that to you. But basically, I saw danger and operated in a state of cognitive dissonance to function at work. B/c if I really could say what he was doing to me I would not only have a job I would be destroyed in the industry. Look at what I am going thru now with this job and his attempts to still insert himself into my life. I will send you the thread to your g-mail."
>
> D-AIC "Okay. I know one cannot help who one likes. It's not logical. I can't understand why he won't back away from you after all the shame he's endured. Maybe he doesn't see it like that."
>
> Plaintiff: "B/c it is not really shame. I found out that he was actually letting Scott and Rich and others (all men) believe he had a sexual relationship with me. He did not have any such relationship with me and when I confronted Scott that people were saying that and I was concerned that [SMO] was allowing that to be said then that is when they panicked about the severe legalities that existed. I made Scott provide me with a writing in late 2019 that [SMO]

formally represented that he never had a sexual relationship with me. But really Scott knows how he let that false rumor go on for years."

D-AIC "Well I never thought you had a sexual relationship ever. Those rumors are disgusting and [SMO] should worry about them leaking to his wife she probably doesn't know the extent to which he was investigated because he hides information."

## FACTS RELEVANT TO THE PLAINTIFF'S CURRENT CLAIMS OF DISCRIMINAITON

## QUID PRO QUO SEXUAL HARASSMENT

48. On February 27, 2023, directly after going to an interview with the prospective employer for a career advancing position, the Plaintiff called SMO on his LAS office line from her residential line and left a message. Plaintiff obtained the Verizon Business Certified Records of this call and provided them to the defendant on April 2, 2024 via email, as such they are incorporated herein by reference. The Plaintiff then sent an email to SMO on his LAS email restating the content of her phone message as follows;

"HI ,I left you a message on your office phone. I interviewed today at [prospective employment] for a family court supervisor position and [prospective employer] brought you up and had many praises for you. He said he was going to give you a call. I would greatly appreciate it if we could speak today. Let me know what is a good time for you. Thanks"

49. On February 27, 2023 SMO called the Plaintiff's residential landline from his LAS office line and in a 28:08 minute call SMO engaged in Quid Pro Quo Sexual Harassment of the Plaintiff by making sexual advances and then after the Plaintiff's rejection threatening to take material adverse work action by altering the specified contractual terms, conditions, and benefits of her employment, ( ie., "CBA section 3.4.4.4 agreement" sections 1-g, 1-h, 6, 7-b, 11) by giving an unauthorized, false, inflammatory and disparaging statements to prospective employer. Plaintiff obtained the Verizon Business Certified Records of this call and provided them to the defendant on April 2, 2024 via email, as such they are incorporated herein by reference.

**The History SMO's Sexual Harassment of the Plaintiff Relevant to Understanding the Context of the Sexual Advances on the Quid Pro Quo Telephone Call.**

50.  SMO initiated a flirtation and made sexual advances to the Plaintiff in January 2015 when he asked her to meet him at the CDP-BO#1 office over the MLK weekend to assist him in preparing an Integrated Domestic Violence CLE. The office was closed on the weekends and it was understood they would be there alone. The Plaintiff declined to meet SMO at the office, instead she assisted him in preparing the CLE over the phone, email, and text throughout the entire weekend. (This work materialized into a power point which SMO presented at a CLE a week or so thereafter). After the MLK weekend SMO would come to the Plaintiff's office often. SMO would particularly come to the Plaintiff's office three to four times a week ranging between the hours of 5:30pm -6:30pm when most staff were long gone for the work day. SMO would interact with the Plaintiff in cyclical phases (ie., #1 friendly neutral toned, #2 flirtatious, #3 verbally and physically sexualized manner, #4 angry/mean/difficult, #5 silence/avoidance). While in phase #3 SMO would stand or sit very neat the Plaintiff and reach or point at things that facilitated him making contact with the Plaintiff's chest area with his arm, gaze into the Plaintiff's eyes for extended periods of time and simultaneously slow stroke his face or fore arm with his hand, use a sexualized tone of voice with sexualized sighs (ie., hmmmmm, ahhhhhh), refer to the Plaintiff as "we" "our", tell the Plaintiff he "likes when they talk to each other" in this (phase #3) manner (despite the fact it was only him talking in that manner), direct the Plaintiff to not cross her arms around her breast area when he was in her office after hours (thus giving him a better view of her breast area at a time when she had her suit jacket off and was in her suit blouse), and tell the Plaintiff that she is the only staff attorney that he spends as much time with as he does. All of these actions were unwanted by the Plaintiff. The Plaintiff would orchestrate a disagreement to break the trajectory of SMO in Phase #3. This would shift SMO into phase #4 where he would holler

and use an angry tone voice toward the Plaintiff. It was in the #4 phase that SMO would use the word "insubordination" often. This would shift SMO into phase #5 where he would not speak to the Plaintiff but would send her emails subjecting her work to heightened scrutiny. The Plaintiff liked SMO when he was in the #1 phase and could tolerate him in #2 phase. However, it was phases #3 - #5 that she did not like his behavior. It made her feel extremely anxious and concerned about her job security. The Plaintiff would give in to SMO often during phase #4 & #5 and engage him in the sexualized role playing he demanded of her inorder to avoid the threats of insubordination and heightened scrutiny of her work. There were three role play scenarios SMO orchestrated; *cheerleader* in awe of his intelligence and male prowess, *damsel in distress* in need of help only he could provide, *disobedient child* that he can but chooses not to discipline.

51. The Plaintiff would complain often to Supervisor #2, stating that it seemed to Plaintiff that SMO wanted to have sexual relations with her in the office and for her to initiate it physically. Supervisor#2 would often reply "he is hopeful." By late August 2015 the Plaintiff's colleague approached her and said that she had to tell SMO to stop coming to her office because staff were talking that there was something going on between them and they were having sexual relations. The Plaintiff then told SMO he could not come to her office or otherwise be seen with her. Although SMO complied with the request not to come to the Plaintiff's office he subjected the Plaintiff's work to heightened scrutiny and interfered with social office events that she had organized for CDP- BO #1. SMO questioned the Plaintiff's paralegal and investigator about her work and this made them uncomfortable and the Plaintiff embarrassed. In early late October 2015 the Plaintiff told SMO he could come to her office again to put a stop to his behavior. SMO #1's cyclical pattern of behavior resumed up to her transfer to CDP-BO#2.

52. The Plaintiff and SMO did not have much interaction in 2017 and 2018. In 2019 the parties had a lot of contacts through email, text and telephone related to indicted trials of cases of the Plaintiff's at CDP-BO #2. In late August 2019 when the Plaintiff heard a 2016 rumor resurface (that her and SMO had a sexual relationship while she worked at CDP-BO#1) she was devastated and believed that SMO's relentless focus on her when she was in CDP-BO#1 was the cause of the rumor. The Plaintiff was also very concerned that SMO had a role in the rumor resurfacing because of its timing in relation to SMO having a lot of contacts in 2019 over work related cases.  The Plaintiff confronted SMO but he would not acknowledge her concerns about the rumor. The 2019 contacts between the SMO and the Plaintiff ended by the end of 2019.  The parties did not interact throughout most of 2020 and their interactions in 2021 and 2022 were client and business related when circumstances arose. The last communications between the Plaintiff and SMO prior to the February 27, 2023 quid pro quo call was January 11, 2023 when the Plaintiff emailed him seeking a document she had provided to him in 2014 when she was hired for the staff attorney position. SMO responded in less than an hour attaching the document and wished her good luck on the interview she needed the document for.

**February 27, 2023  Quid Pro Quo Telephone Call**

53. During the February 27, 2023 call, after being notified that Supervisor #2 was one of the Plaintiff's references and that the Plaintiff wanted SMO to avoid prospective employers call, SMO changed his tone of voice to a sexualized parental role playing voice and told the Plaintiff that he would *"have to take the call and give his honest opinions"* of her. Based on numerous past interactions with SMO the Plaintiff recognized this sexualized parental role playing tone and SMO response, (he's *"have to take the call and give his honest opinions"*) to be a sexual advance inviting Plaintiff to engage the sexual role play discourse he historically demanded of her for his sexual

and misogynistic pleasure (ie., SMO has the power to "discipline the Plaintiff" but can choose not to if she, responds to him like a "begging child"). The Plaintiff objectively and subjectively understood that SMO was threatening to make unauthorized, false, disparaging and inflammatory statements to [prospective employer] by his terminology *"my honest opinions"* if the Plaintiff did not participate in sexual role play discourse with him on the phone for his sexual and misogynistic pleasure. After the Plaintiff was unsuccessful in getting SMO to agree to avoid the [prospective employers] call, she gave in and asked in a childlike tone of voice what were his *"honest opinions"* of her. SMO then changed his tone of voice to sexualized/romanticized tone and provided vivid references and romanticized descriptions of the Plaintiff's IDV practice at the CDP-BO #1 office 8-9 years prior (11/14 to 5/16) and inappropriately used the words *"passionate"* and *"love and loved"* repeatedly about the Plaintiff and the feelings of "others" toward the Plaintiff. SMO then elevated his sexual advances and stated in a very sexualized tone ***"hmmmm just the other day I was looking at the IDV CLE power-point presentation "*** . This was a direct reference to an IDV powerpoint presentation he and the Plaintiff worked on in January 2015, a weekend that marked the start of his sexual advances and intense focus on the Plaintiff throughout her employ at CDP-BO #1. The Plaintiff interrupted him changed her tone and told him in assertive tone "No" that she only wanted Supervisor #2 to speak to [prospective employer]. The Plaintiff objectively and subjectively understood the reference to *"looking at the IDV-CLE presentation"*, *"just the other day"* to be a sexual advance based several factors, [i] the numerous past interactions the Plaintiff had with SMO, [ii] the standards in legal practice with respect to CLEs (ie., nine year old power point presentation would not be a relevant in any context to look at), and [iii]SMO did not practice or teach IDV. Angered by the Plaintiff's outright rejection, SMO then changed his tone to an angry one and threatened multiple times to tell the prospective employer that the Plaintiff was *"on leave,*

*looking for work, and working with general counsel."* The Plaintiff told SMO that he is not permitted to say that in any context and she managed to diffuse the conversation to avoid an argument and concluded the call stating she would contact GC-Rosenberg about the anticipated [prospective employer] call and he would get back to [SMO] on how to proceed.

## Sequence of Events After the Quid Pro Quo Call

### February 27, 2023

54. On February 27, 2023 at 2:56 pm, immediately after getting off the phone with SMO the Plaintiff immediately sent an email to GC-Rosenberg for the purpose of establishing that GC-Rosenberg direct SMO to not return any communication from prospective employer about the Plaintiff given SMO's past EEO history with the Plaintiff and LAS past disciplinary directives to SMO to not communicated or have contact with the Plaintiff. The Plaintiff's email stated in pertinent part;

> "I am writing to go over some clarifications about references. I interviewed at [prospective employer] this morning for a Family Court Supervisor position...[prospective employer] asked if I knew [SMO] I said he was my supervisor in [CDP-BO#1]. [Prospective employer] then went on to praise [SMO] and all the work they have done on [Legal Organization], what a nice guy he is and how smart he is ect., At the end of the interview [prospective employer] asked me to provide 3 references and said he is also going to give [SMO] a call. What could I say to that?...What is your position on this matter and how to handle it? ..."

GC Rosenberg did not respond. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

### February 28, 2023

55. The Plaintiff sent a follow up email to GC- Rosenberg and SMO on the morning of February 28, 2025 at 9:12 am, (the sentences in bold are some of the statements SMO made on the February 27, 2023 telephone call.)

"Subject: Urgent Re: reference clarifications

"Hello Scott & [SMO]
I need to provide 3 references to [prospective employer] and I would prefer to do that this morning as I have already received an email last night about a meeting this Thursday with the [prospective employer] … Bureau Chief, **I am not listing [SMO] as a reference** but as I explain below I did not say "no" to [prospective employer] when he said he was going to call [SMO]. I want you both to confirm the following if [prospective employer] does call [SMO]that he would state the following
a. **he was my supervisor from 11/14 to 5/16 in …where I covered the IDV practice as well as doing the criminal practice**
b. **He is familiar with work in family practice and found me to be knowledgeable, passionate and loved by the clients and the court**
c. **I helped him prepare for an IDV CLE in Jan 2015**
d. I provided trainings for…staff on IDV practice matters
e. I circulated outlines for staff on how to screen for possible ACS involvement with the client based on the criminal court complaint arraigned and a sample letter to provide the client in arraignments *(see enclosed)*
d. **He did not have any work related supervision over me after I left [CDP-BO #1]**
e. I have circulated motions, transcripts and issue alerts to CDP on various matters related to criminal practice and from time to time he has read them
(if he has in fact read them)
f. I have been employed as a senior trial staff attorney from **May 2016 to present** in the Criminal Defense practice …
e. He is now aware (because I told him about the interview) that I want to transition back to family practice representing the parents and that LAS does not do family practice representing the parents …
I am very committed to obtaining this position at … and refocusing on Family Court Practice… [prospective employer] seems to think very highly of [SMO] and if he should be called by him, then [SMO] stating all of the above ( or [SMO's] version of all of the above) would go very far for me getting this position. Please confirm …"

The Plaintiff did not hear back from GC-Rosenberg and sent a follow up email to GC-

Rosenberg and SMO in the afternoon of February 28, 2025 at 4:06 pm stating the following

among other things;

**"Subject:** RE: Urgent Re: reference clarifications
Hello, I need to send my references and I must know how [SMO ] is going to handle this situation. I am not listing [SMO] as a reference but , again, I did not say no to [prospective employer] when he said he was also going to call [SMO ]."

56. CG-Rosenberg spoke with SMO after the Plaintiff's 4:06 pm email. GC Rosenberg then

emailed the Plaintiff on February 28, 2023 at 5:06 pm. **This email is one of many continuous**

**and concerted emails to the Plaintiff that was permeated with discriminatory intimidation,**

**ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment**

**for the Plaintiff.** Said email stated in pertinent part;

> "Subject: RE: Urgent Re: reference clarifications…
> To the extent [SMO] would be speaking for LAS, the agreement we signed is very clear: If a future employer contacts LAS regarding your employment, LAS will provide that employer with your positions held, dates of employment, and nothing further. **[SMO] is free (but not required) to respond to a reference call in his personal capacity. If he chooses to respond in that capacity, what he says will depend on what is asked. His responses will not be constrained. [SMO] is willing to give you the choice of how to proceed. Either he will respond in a personal capacity in the manner he judges appropriate depending on the questions that are asked;** or alternatively, he can respond that that per LAS policy, he can only give your positions held and dates of employment."

The Plaintiff responded to this email on February 28, 2023 at 6:14pm with protest and stating in pertinent part;

> "Subject: RE: Urgent Re: reference clarifications…
> Our agreement is that nothing disparaging will be said about me and that I am currently employed at LAS as a senior trial staff attorney.
> It is my understanding that our written contract is only known to you, Twyla, and the staff that needs to process financial related matters relating to it, ie., pay, health and pension benefits. That means [SMO] should not have any information about our agreement or my dealings with you. Please confirm that [SMO] does not have information about my dealings with you, the contract and underlying facts about it."

CG-Rosenberg did not respond to the Plaintiff's email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference

57. On February 28, 2023 at approximately 7:30 pm the Plaintiff called CG-Rosenberg's cellphone to discuss his 4:06 pm email further. Plaintiff told GC-Rosenberg that she spoke with SMO on February 27, 2025, directly after the interview with [prospective employer] and that during that call he stated he knew *"she was on leave, looking for work and working with Scott"*. Plaintiff told GC-Rosenberg that SMO should have no information about any dealings the Plaintiff had with GC-Rosenberg and that SMO was threatening to say this to the prospective employer on the anticipated call. Plaintiff stated that she did not want SMO to be a personal capacity reference and that she did not want him to speak to prospective employer **at all,** especially given his EEO history with the Plaintiff. The Plaintiff further stated that the benefits of her employment as per the section

"CBA section 3.4.4.4. agreement" gave her the sole authorization to seek and authorize personal capacity references and **that it was outrageous for GC-Rosenberg to state to the Plaintiff in his earlier email that SMO *"was willing to give the Plaintiff the choice"* if she wanted him to give an official reference or a personal capacity reference.** Plaintiff further stated that the "CBA section 3.4.4.4. agreement" required that LAS not interfere with her efforts to obtain new employment and that LAS not disparage her in any way. The Plaintiff demanded that GC-Rosenberg instruct SMO to avoid the anticipated call at all costs. GC-Rosenberg stated that he would talk to SMO and instruct him to avoid the call.

**March 1, 2023**

58. On March 1, 2023 the Plaintiff sent GC-Rosenberg and email at 8:21am stating in pertinent part;

"Thank you for taking my call last night. Enclosed is the Twyla Carter letter that states that I am employed at LAS as a senior trial attorney in the CDP from **November 17, 2014 to present date.** AS per our contract and this letter please clarify to the following people  they **are NOT** to, in an official LAS capacity or in a personal capacity , comment, communicate or insinuate to anyone, especially to prospective employers,  that my employment status is or was anything else other  then what the letter states from **November 17, 2014 to present date. ...**Please confirm that you have so notified these people and you have my permission to provide the letter to them.
[SMO] *
[AIC-CDP] *...
I do intend to speak to [SMO ] today after I receive your confirmation so that I can make sure that he is one the same page with me as to how to handle a potential call from [prospective employer]. Again I am not providing [SMO] on the list of references but based on what [prospective employer] said I anticipate he may get a call.Thank you for your cooperation in this matter ..."

GC-Rosenberg responded to the Plaintiff at 9:29am on March 1, 2023 stating the following;

"The individuals listed below have been so advised."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

59.    On March 1, 2023 between 9:45 am and 10:58am in a series of email exchanges between SMO  and the Plaintiff, **SMO continued his discriminatory intent toward the plaintiff with**

**regard to her specified prospective employment application. It was subjectively and objectively reasonable for the Plaintiff to interpret the content of SMO's emails as continued Quid Pro Quo Harassment (punishment for the Plaintiff's rejection on the February 27, 2023 telephone call).** It was not reasonable or consistent with industry standards and practice in the legal profession for SMO to tell the Plaintiff, an attorney/colleague in a reference situation, that he would give his "honest personal opinions" based on the questions asked and then refuse to discuss what his honest opinions are. It was also not reasonable under the circumstances where SMO was told multiple times by Plaintiff that she had the sole authority to request and authorize "personal capacity references" and that she was not requesting or authorizing him to be a " personal capacity reference" for SMO to keep writing to the Plaintiff that it was his option to give personal capacity references regardless of the Plaintiff's request and consent that he do so. That email conversation stated the following;

On March 1, 2023 at 9:45 am the Plaintiff sent an email to [SMO] stating the following;

> "Subject: Update on call situation
> Scott just confirmed that he sent a notification to you and select others regarding my employment status at LAS and related matters. I had advised him that I would be reaching out to you upon receiving his confirmation to go over how a potential call from [prospective employer] to you will be addressed in a manner that is agreeable to both of us. Scott has presented no objection to that call. That being said I did submit my 3 references to [prospective employer] this morning, you are not on that list but I expect you will get a call from [prospective employer]. When is a good time for us to talk today? Thank you."

On March 1, 2023 at 10:am SMO responded to Plaintiff's email, cc'ing GC-Rosenberg and stating the following;

> "Subject: RE: Update on call situation
> Adding Scott
> If I am contacted, I understand that there is a LAS statement regarding your current employment as an attorney in CDP-BO #2 and dates. I can speak in my personal capacity and if so I would clearly indicate it. **If so, my answers will depend on the questions presented. They would be my honest personal opinions."**

On March 1, 2023 at 10:20am the Plaintiff responded to SMO's email, cc'ing GC-Rosenberg and stating the following;

"Subject: Update on call situation
Scott & [SMO]
[SMO's ] email below presents too many legal complications for LAS in terms of contractual matters that cannot be disclosed to [SMO]. Put simply [SMO] is not free to state opinions about me in his personal or LAS capacity that in any way disparage me. **That being said, I am not giving [SMO] or any other LAS employee permission at this time to give any opinion or experience account of me in their personal capacity unless they have received my prior express approval.**
**I am directing [SMO] that if [prospective employer] calls him to state that he can only provide the limited information in an official LAS capacity(current employment position and dates of employment ) and that for any reference/ information in his personal capacity he would need to reach out to me to obtain my approval to do so.**
Please both confirm you understand this directive."

On March 1, 2023 at 10:23 am the SMO responded to Plaintiff's email, cc'ing GC-Rosenberg and stating the following;
"Subject: RE: Update on call situation
**Not sure how a person can dictate and mandate a personal opinion of another,** but I will give the official statement if a person calls."

On March 1, 2023 at 10:58 am the Plaintiff responded to SMO's email, cc'ing GC-Rosenberg and stating the following;
"Subject: RE: Update on call situation
[SMO]
You are getting the legalities confused.
**I am not authorizing you at this time to give a personal reference,  comment or communication about me in any format. If [prospective employer] calls you then legally you can only state that in your LAS capacity what my position is, and my dates of employment Nov 2014 to present.**
Then you can state that you are permitted to give a reference for me in your personal capacity but that you need my consent to do that, so you will check with me.
**I can legally direct you at this time not to give a personal reference.** I would only give you consent to give a personal reference if I knew what you were going to state.
I am sure you can understand why I would not give consent unless I knew what you were going to say. You seem to be indicating that you do not want to speak with me on the phone about what you would say. Under those circumstances I can not give consent.
However if you are willing to discuss on the phone what you would say then let me know."

After this very clear notification in the Plaintiff's email, SMO never reached out to the Plaintiff by any method of communication to discuss what his "honest personal opinions" of the Plaintiff were or what he would otherwise say to the prospective employer. Likewise, the Plaintiff never reached out to SMO to discuss what his "honest personal opinions" of her were or what he would otherwise say should she give him permission to give a personal capacity reference. Furthermore

after the aforementioned email exchange, which GC Rosenberg was fully privy to, and under circumstances where GC Rosenberg was aware SMO's emails demonstrating his hostility and discriminatory intent toward the Plaintiff, GC Rosenberg took no steps to restrict SMO from having any contact with prospective employer about Plaintiff's application. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

### SMOs First [Quid Pro Quo] Material Adverse Work Action Against The Plaintiff For Her Initial And Continued Rejection Of His Sexual Advances On The February 27, 2023 Quid Quo Pro Telephone Call.

60. After the Plaintiff's email on March 1, 2023 at 10:58 SMO went into Supervisor #2's office and directed her she could not give an "official reference" for the Plaintiff to Prospective Employer. Supervisor #2 was SMO subordinate at that time. **This act by SMO constituted a material adverse work action against the Plaintiff for her rejection of SMO's sexual advances on the February 27, 2023 Quid Quo Pro telephone call, and it altered and deprived the Plaintiff of specified contractual material and tangible terms, conditions and job benefits as per the CBA section 3.4.4.4. agreement** (ie., sections (1) (g) "LAS shall not interfere with [Plaintiff's] efforts to obtain employment").

61. Supervisor #2 immediately informed the Plaintiff in a text conversation that SMO was interfering with her efforts to obtain new employment. The following is the pertinent part of the text conversation between Supervisor #2 and the Plaintiff ;

Plaintiff: " Hi, Ofcourse [SMO] has caused chaos with the [prospective employment] reference
   Issues. He is not listed as a reference but the AIC [prospective employment] asked if I knew
   him and I said he was my supervisor in [CDP-BO#1] Apparently the guy works with him on
   [legal organization] and thinks highly of him and said he would call [SMO]. What could I say
   to that? When I called [SMO] to let him know he started referencing matters that he should
   not contractually know. So I got Scott involved. Twyla then got involved and she notified
   [CDP-BO#2] and select others that I am employed at LAS as a senior trial atty in cdp nov
   2014 to present and that no one is to mention the leave at all. I don't know if you got the

email. Again thank you for helping me out with getting this job. To clarify, LAS staff is permitted to give a personal reference but must stated it is in a personal capacity. But either in a personal or official capacity no one is to mention the leave."

Supervisor #2. "No I didn't and I wasn't going to say you are on leave. No one has reached out to me yet. [SMO] is the AIC and I was the sup. I'm not going to mention a leave and I will give a reference in both my official and personal capacity. [SMO] said I could not give one in my official capacity but until someone higher than him tells me I'm ignoring that. AIC-CDP is my direct supervisor not him. **[SMO] is an interested party he is biased.** Further it was improper for him to approach me about this. How did he know I am a reference for you. It is none of his business."

Plaintiff: "I sent you the thread with him to your gmail. It just obvious and ridiculous how he devolves into inappropriate and personal tantrums when it comes to me."

Supervisor #2:"Liked"   (I sent you the thread with him to your gmail. It just obvious and ridiculous how he  devolves into inappropriate and personal tantrums when it comes to me.)
Thanks"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 3, 2023**

62. On March 3, 2023 in a series of email exchanges between SMO and the Plaintiff, SMO acknowledged that he did not have permission to give a personal capacity reference and that he was only limited to making the "official capacity" reference (dates of employment and positions held) should prospective employer call him.  Those emails are as follows;

On March 3, 2023 at 1:09 pm the Plaintiff sent SMO an email with a blank subject line stating the following;

"Hi, I had the second interview today and the Bureau Chief said [prospective employer] would be calling my references. I would greatly appreciate it if you would take my call to make sure we are on the same page with the limits of the official reference aspect of things ect., Please understand my level of anxiety over all of this.
I also want this under control because you will apparently have future work contacts with him."

SMO responded to the Plaintiff's email on March 3, 2023 at 1:27pm, cc'ing GC-Rosenberg

and changing the subject line to "RE: Official Capacity", his email stated the following;

> "Subject: Re: official capacity
> Adding Scott
> **As I understand it, I will not give a reference in personal capacity and will comply with**
> **the official response if I'm contacted as Scott provided.**
> I am in meetings today and traveling and not available for next few days."

The Plaintiff responded to SMO, cc'ing GC-Rosenberg in an email on March 3, 2023 at 1:35pm

stating the following;

> "Re: official capacity
> Ok thanks for confirming your understanding.
> **Try to avoid the call or email**. It sounds like you are super busy and can fall back on that as
> a reason you didnt answer. By then hopefully I will have the offer for the position and it wont
> be an issue. I realize you will have future work related contacts with him so its best to keep
> things now and in the future on as little as said basis.
> As far as [prospective employer] knows you were my [CDP-BO#1] supervisor, and I
> presented some of my ideas to you & other management players about how to handle the new
> discovery on caseload demands. FYI I originally said mgmt that is when he asked if I knew
> you by name."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

**March 9, 2023**

63. On March 9, 2023 at 11:49 am the Plaintiff sent SMO an email stating the following;

> "**Subject:** Re: official capacity
> Hi
> Sorry to be a pest...
> ... has [prospective employer] tried to contact you ?
> Ie. Call, email, VM?"

On March 9, 2023 at 12:41 SMO sent the Plaintiff an email stating the following;

> "Silence so far"

On March 9, 2023 at 1:26pm the Plaintiff sent SMO an email stating the following;

> "Ok, thanks for the update."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 10, 2023**

64. On March 10, 2023 at 12:03 pm prospective employer sent an email to SMO stating the following;

> "Good Afternoon [SMO]
> I hope all is well. We recently interviewed a [CDP-BO#2] Legal Aid Attorney, [Plaintiff] for a supervisory position in our Family Court Bureau. [Plaintiff] previously worked in the [CPD-BO#1] office. Can you please call me at your convenience to discuss [ Plaintiff's] work history in your office. My office line is…. Thank you [prospective employer]"

This existence of this email was not made known to the Plaintiff until February 24, 2023 when she received it as part of LAS position statement to the charges she filed in the EEOC. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 14 & 15, 2023**

65. On March 14, 2023 the Prospective employer left voice mail messages for all three of the references the Plaintiff previously submitted to him on March 1, 2023 via email (ie., Supervisor #3, Supervisor #2 and S.Ct.Judge). On the message Prospective Employer stated that he would be calling them the following day on March 15, 2023. On March 15, 2023 the prospective employer had telephone conversations with two of the Plaintiff's references (Supervisor # 3 , the Judge). During both reference calls Prospective Employer displayed enthusiasm in filling the position with the Plaintiff and Supervisor #3 and the Judge gave glowing reviews of the Plaintiff and her work. Supervisor #2 did not respond to the Prospective Employers message about taking a reference call on March 15, 2023. Because of SMO's directive on March 1, 2023, Supervisor #2 never provided a personal capacity or an official reference for the Plaintiff that she agreed in writing on prior occasions to give. **SMO's unlawful directive to Supervisor #2 to not give and official reference**

43

**and her compliance with that unlawful directive resulted in this further material adverse work action against the Plaintiff that altered and deprived the Plaintiff of specified contractual material and tangible terms, conditions and job benefits as per the CBA section 3.4.4.4. agreement (ie., sections (1) (g) "LAS shall not interfere with [Plaintiff's] efforts to obtain employment"**

**SMO's Second [Quid Pro Quo]Material Adverse Work Action Against The Plaintiff For Her Initial And Continued Rejection Of His Sexual Advances On The February 27, 2023 Telephone Call.**

66. On information and belief, source of that belief being statements made by Prospective Employer to the Plaintiff on a 17 minute telephone on April 10, 2023, sometime between the March 10, 2023 email to SMO and March 14, 2023 prospective employer made arrangements with SMO to have a call on March 15, 2023 regarding the Plaintiff's application at prospective employment. The method of communication between SMO and the prospective employer to arrange the March 15, 2023 call has still not been disclosed to the Plaintiff. **In any event all communications from the prospective employer to SMO have been made on official LAS email system and phone systems and were sought from and delivered by SMO in official capacity under the weight and authority of The Legal Aid Society of New York.**

67. On the April 10, 2023 17 minute phone call the prospective employer told the Plaintiff that he had a telephone conversation with SMO about the Plaintiff's application between his call with Supervisor #2 (mid-morning March 15, 2023) and the Judge (approximately 1:15pm-1:30pm March 15, 2023). The prospective employer further disclosed to the Plaintiff the contents of his call with SMO on March 15, 2023. SMO's statements were unauthorized, false, disparaging, slanderous and maligning and in violation of the "CBA section 3.4.4.4. Agreement." Plaintiff

obtained the Verizon Business Certified Records of this call and provided them to the defendant on April 2, 2024 via email, as such they are incorporated herein by reference.

After the call the Plaintiff memorialized her telephone conversation with prospective employer in an email and sent it to the prospective employer for confirmation. On April 11, 2023 the prospective employer confirmed the accuracy of the Plaintiff's email. **This act by SMO constituted a material adverse work action against the Plaintiff for her rejection of SMO's sexual advances on the February 27, 2023 Quid Pro Quo  telephone call, and it altered and deprived the Plaintiff of specified contractual material and tangible terms, conditions and job benefits as per the CBA section 3.4.4.4. agreement,** ( ie., sections (1) (g) "LAS shall not interfere with [Plaintiff's] efforts to obtain employment"), **(1)**(h) "If a future employer contacts LAS regarding [Plaintiff's] employment, LAS will provide that employer with a neutral reference, which included only [Plaintiff's] name, positions held, and dates of employment, and nothing further, (7) (b) LAS representatives…shall not make any statement to any person, , whether written or oral, and whether expressed as fact, opinion or otherwise, that disparages, maligns, libels or slanders [Plaintiff]).

The prospective employer stated following to the Plaintiff on the April 10, 2023 telephone call, that SMO made the following unauthorized, false and disparaging statements to him on a March 15, 2023 telephone call;

> 1. Plaintiff worked in the [CDP-BO#1] Office as a trial staff attorney,
> 2. SMO did not represent to the prospective employer that pursuant to LAS policy he could only provide that information and then went on to state unprompted that;
> 3. he did not have a lot of interaction with the Plaintiff nor did he supervise her while she was as the [CDP-BO#1] office,
> 4. he stated that the Plaintiff did Criminal Trials and that he did not recall or state that she did family court work while in [CDP-BO#1],
> 5. he  thought I transferred to the [CDP-BO#2] office to be closer to home.
> 6. he did not recollect the Plaintiff very well and could not address any qualities about her in terms that could be understood as a favorable endorsement.

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 20, 2023**

68. On March 20, 2023 the Plaintiff sent SMO an email and inquired "Have you been contacted by [prospective employer] ? " SMO did not respond to the Plaintiff's email.

**March 22, 2023**

69. On March 22, 2023 between 2:37 pm and 3:12pm the Plaintiff and SMO had the following email communications,

Plaintiff:  "Hello.2 of my references were contacted last week and it went well. Please let me know if you were contacted because I want to send follow up correspondence this afternoon."

SMO : "Yes he reached out"

Plaintiff: "When? How did it go?"

SMO : "Few days ago.  Fine"

Plaintiff: "Was it before the weekend? Or Monday or yesterday? Can you take a call ? …

SMO :     "Adding Scott
[prospective employer] called early last week, ie a week ago
As you and Scott instructed, I followed your guidance.
I cannot take a call as I'm in a conference today and tomorrow"

This constitutes the very last communications the Plaintiff received from SMO. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

70. On March 22, 2023 at 3:37pm the Plaintiff sent an email to GC-Rosenberg and SMO stating in pertinent part;
"Scott per our agreement please direct [SMO] to answer my questions below
1. Did he call you prior to last Wed March 15, 2023?
2. Did he mention that he spoke to my 2 other references b/4 calling you?
3. Did you memorialize to Scott R. Via email that [prospective employer] called you?
4. What did [prospective employer] say when you said you need my permission to give

a personal reference?
5. Did he ask you if you have any hesitations about him hiring me (as my other two references reported)?
6. If so how did you respond?
7. Please indicate exactly what you said to him?
8. How did he make contact with you initially? Phone message, email ?
I didnt list you or your contact info.
 Please answer these questions now"

GC-Rosenberg responded to Plaintiff in an email on March 22, 2023 at 3:45pm, cc'ing SMO stating in pertinent part;
"Per our agreement, acting as an employee of LAS, [SMO] is permitted only to give your job title and dates of employment.  You may authorize him to respond in a personal capacity; however, he has no obligation to do so.  If you authorize him to respond in a personal capacity, nothing in the agreement specifies what he can or should say in that regard.  I have no authority to direct what he chooses to say or not say in a personal capacity."

The Plaintiff responded to GC-Rosenberg in an email on March 22,2023, at 3:45pm, cc'ing SMO, stating in pertinent part;
"Please stop with your non responsive emails to my lawful questions.
LAS is contractually not permitted to interfere with my efforts at obtaining other employment. That requires you to contractually answer my inquiry related to that issue... Please answer my questions about the details of the call!"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

71. Plaintiff, in an extremely anxious state, immediately called GC-Rosenberg on his phone and demanded that GC-Rosenberg get the answers from SMO to her questions. GC-Rosenberg had apparently spoke to SMO about the call. GC Rosenberg told the Plaintiff in a condescending and sexist tone that SMO made favorable comments about the Plaintiff's work when she was in CDP-BO #1 to the prospective employer because the prospective employer expressed he had concerns with the Plaintiff's application. Plaintiff protested that SMO was supposed to avoid the call from the prospective employer and if it could not be avoided then SMO was only supposed to state her dates of employment and positions held. GC-Rosenberg stated SMO was "trying to help the Plaintiff get the position." The Plaintiff concluded the call stating that she will see what

happens with her application with the prospective employer. The Plaintiff was in an extreme state of anxiety that SMO had sabotaged her application and GC Rosenberg was covering that up.

**March 24 & 25, 2023**

72. On March 24, 2023 10:59 am the Plaintiff sent an email to SMO and GC- Rosenberg using a pre-texual scenario in an effort to obtain the specific statements SMO said to prospective employer. That email stated the following in pertinent part;

> "Hello [SMO]  & Scott
> I am drafting follow up correspondence to [prospective employer]...
> This would give me insight on how to finesse my follow up correspondence."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 27, 2023**

73. On March 27, 2023 at 11:50am GC-Rosenberg sent an email solely to the Plaintiff stating the following;
> "We wish you every success in your job search.  However, our agreement does not oblige [SMO] or any other LAS staff member to assist you in your job search by providing, for example, information about conversations [SMO] has had in the past with potential employers concerning criminal justice matters."

On March 27, 2023 at 12:55pm the Plaintiff sent an email to GC -Rosenberg stating in pertinent part;
> "You know by the words in my emails that I am not asking [SMO] to tell me about past conversations or working relationships he had with [prospective employer]. Indeed [prospective employer]told me alot about that at the interview.I specifically wrote several times to you and [SMO] that [SMO] does not have my permission to give a personal reference, that he is restricted to a LAS official capacity  to contents in the letter Twyla Carter wrote, and that  he is specifically to AVOID [prospective employer's]  call and avoid speaking to [prospective employer] at all about me.
> As per your statements on the phone to me [SMO] did not stick to Twyla's or my directive and gave a reference to [prospective employer]  addressing his personal experiences with me in [CDP-BO#1]. His actions are a contract violation in this regard...
> In this regard, you are obligated to provide me with full details of the entire call and answer any further questions I may have. I am only inquiring about the content of the phone call between [SMO] and [prospective employer] that was initiated by [SMO] via returning [prospective employee] message to [SMO] about a reference for me.

I am entitled to this information pursuant to our contract and you are obligated to provide it. Please provide me the information by email or arrange a call between the 3 of us so I can obtain the information I am legally entitled to by our contract."…

On March 27, 2023 at 1:50pm GC-Rosenberg replied to the Plaintiff. **This email is one of many continuous and concerted emails to the Plaintiff that was permeated with discriminatory intimidation, ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.** GC Rosenberg's email to the Plaintiff stated;

" I disagree with your characterizations below. [SMO] could not avoid [prospective employer's] call, as you suggest, since the agreement states that if a future employer contacts LAS regarding your employment, LAS is required to respond by giving your positions held and dates of employment. [SMO] had no choice but to accept the call; he could not have "avoided" the call, as you suggested. Once [SMO] accepted the call, and was pressed for further information, **he made the decision that he believed was most beneficial to you.** This was – in his personal capacity – to describe your work while on [CDP-BO#1]. in a favorable manner. **He made the judgment that, acting in a personal capacity, you would have preferred him to answer in that manner than the alternative, which was to say that he is not allowed to give any information other than your positions and dates of employment. That would have been a huge red flag, which would probably have undermined your application. [SMO] did his best to avoid undermining your application by responding in the manner he understood as authorized in his personal capacity. In my opinion, for that you should be grateful.**

We, like you, want you to succeed in finding new employment. **[SMO ] was doing his best to thread that needle. However, if you are now instructing us that henceforth, if [SMO] or anyone else gets any call from a prospective employer concerning you, the person will respond verbatim, "I am only allowed to give [Plaintiff's] positions and dates of employment, and nothing further," we will do so, no matter how damaging that may be to your application. If that's how you would like to proceed, let me know, and I will so instruct [SMO] and others."**

The Plaintiff was physically and psychologically sickened by GC Rosenberg's pervasively abusive email, especially in the context of all the prior emails and telephone calls he was privy to, whereby the Plaintiff explicitly told him and SMO that SMO had no permission from the Plaintiff to make any statements to the prospective employer other than the Official Contract statement (positions held and dates of employment) and to avoid the call from the prospective employer. In addition to feeling physically and psychologically sickened by reading GC Rosenberg's email the

Plaintiff felt a great sense of crushing fear that not only was SMO intensely focused on her but that

he now had the written backing of the mighty LEGAL AID SOCIETY OF NEW YORK CITY to

quid pro quo sexually harass the Plaintiff indefinitely either on the job with the prospective

employer or on other legal service jobs. To this day the Plaintiff still feels her heart pounding out

of her chest and the blood filling her ears when she reads this pervasively abusive email from GC

Rosenberg.

74. On March 27, 2023 at 3:13 pm the Plaintiff responded to GC Rosenberg's email by sending
an email stating in pertinent part;

> "Scott, Thank you for the reply and trying to work with me on this issue of [SMO] disregarding
> my directive to avoid the call and to not give a personal reference in the absence of my express
> permission…
>  **Scott it is not reasonable for me to be comfortable with [SMO] speaking on my behalf
> under circumstances where LAS has conducted 2 EEO investigations concerning his
> behavior towards me.**
>   In this regard you and I should probably come up with a better plan to deal with this issue
> as it relates to [SMO] and [CDP-AIC] should they be contacted by future prospective
> employers. It is not reasonable for either of them to speak to anyone about me….
> For now lets hope I get this position and we can part ways. However I want you to get
> details as to
> 1.  what [SMO]exactly said about me to [prospective employer] on the call , so far you have not
>     told me…

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

**March 27, 2023 [Retaliation] [Quid Pro Quo] By SMO Against The Plaintiff For Her
Engagement In Protected Activity On March 3:13pm Email With GC Rosenberg and
Her Initial And Continued Rejection Of His Sexual Advances On The February 27, 2023
Telephone Call.**

75.  On information and belief, source of that belief being statements made by Prospective

Employer and SMO in LAS Opposition Statement to the EEOC, on March 27, 2023 between

3:13pm and 5:45 pm GC Rosenberg had a conversation with SMO whereby he advised him, among

other things, that Plaintiff was complaining that she was uncomfortable with him speaking to

prospective employers about her in any context because of his EEO history with the Plaintiff. After

this conversation an angered SMO retaliated and called Prospective Employer and told him among other negative things that the *"Plaintiff was on leave, looking for new work and working with general counsel."* **This act by SMO, with no legitimate or non retaliatory reason, constituted a material adverse work action against the Plaintiff for her engagement in protected activity, and it altered and deprived the Plaintiff of specified contractual material and tangible terms, conditions and job benefits as per the CBA section 3.4.4.4. agreement ( ie., sections (1) (g), (1) (h), 6, 7(b) ).**

76. On March 27, 2023 at 5:45pm GC-Rosenberg sent the Plaintiff an email stating;

> "I will not debate this point further with you.  Please see my responses to your questions below.
> **[SMO] gave a brief and favorable description of work when you were assigned to the [CDP-BO #1]."**

On March 27, 2023 at 6:07pm Plaintiff sent and email to GC-Rosenberg stating;

> "It is not a matter of debate, it is a matter at trying to remedy violations of our contract and other relevant legal principles.
> Pursuant to our contract provide me with the following details :
> 1. What exactly did [SMO] state in his personal opinion about my time in [CDP-BO#1].Stating he said favorable things is not legally sufficient because that is a subject construct. You say we are debating I say we are not. See how that works Scott...its subjective interpretation. Providing me the words/ sentences [SMO] said to [prospective employer] is not. Putting aside contractual obligations and liability what I am asking is reasonable. Please be reasonable with me."

GC-Rosenberg did not respond to the Plaintiff's email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**March 28, 2023**

77. On March 28, 2023 at 10:52 am the Plaintiff sent an email to GC-Rosenberg stating;

> " Hello Scott, Pursuant to our contract and other relevant laws, in addition to providing me with the
> 1. All, and Exact statement [SMO]  made about me on his phone call with [prospective employer].

2. Please provide me with the exact date and time of the call.
Thank you"

GC-Rosenberg did not respond to the Plaintiff's email until 6pm that day.

78. In the interim the Plaintiff sent an email to the Prospective Employer Mar 28, 2023 at 4:24

PM stating in pertinent part;

"Good Afternoon...I would like to thank you both for the time you have spent in the
consideration of my family court application. I am eager to rejoin the [prospective
employment], especially after meeting with you both a month ago. I look forward to hearing
from you regarding my application.

79. On March 28, 2023 at 6pm GC-Rosenberg sent the Plaintiff an email, **this email is one of**

**many continuous and concerted emails to the Plaintiff that was permeated with**

**discriminatory intimidation, misogyny, sexism, ridicule, insult, humiliation and**

**psychological abuse creating a Hostile Work Environment for the Plaintiff.** The email

stated;

**"Hello [Plaintiff]. On March 22, [SMO] previously advised you that [prospective**
**employer] called him approximately a week earlier, that is, on or about March**
**15. The exact time of day is immaterial. As I have already indicated, [SMO] gave a**
**brief and favorable description of your work when you were assigned to the [CDP-**
**BO#1] office."**

On March 28 2023 at 7:58pm the Plaintiff sent GC-Rosenberg an email stating;

"How do you know it is "favorable"?
Did he disclose to you what he said?
Or are you taking his word for it?
It is material the date and time [SMO] called [prospective employer] back.
If he disclosed to you what he said or if he is refusing to disclose to you what he said then
that is a legal problem for you.
Please disclose to me exactly what [SMO] said about me in that call and the time and date of
the call. You are contractually obligated to do so."

GC-Rosenberg did not respond to the Plaintiff's email. The defendant has possession of the

written documents referred to in this paragraph, as such they are incorporated herein by

reference.

**March 31, 2023**

80. On March 31, 2023 at 1:06 pm the Plaintiff notified GC-Rosenberg and CEO Carter of a

breach of the ["CBA section 3.4.4.4. agreement"] via email that stated in pertinent part;

> "Subject: Re: CONFIDENTIAL: NOTIFICATION of Breach of the ["CBA section
> 3.4.4.4. agreement"]...
> Pursuant to paragraph 9 on the ["CBA section 3.4.4.4. agreement"] ... I am notifying you of a
> material contract breach of sections 1 (g) & 1 (h). More specifically,
> I. LAS violated section 1 (h) on or about March 15, 2023 under circumstances where [SMO]
> knew he had **no permission** from me to do so, made unauthorized statements about me that
> exceed my position held and dates of employment to [prospective employer], and under
> circumstances where he and General Counsel Rosenberg were explicitly directed by me in
> writing on March 1 & 3 2023  that [SMO] was **NOT PERMITTED** to give a personal
> reference or any comment about me outside of the LAS official statement ( position and dates
> of employment) to an anticipated call by prospective employer ... and under circumstances
> where [SMO]  acknowledged to me and General Counsel Rosenberg in writing on March 1 &
> 3, 2023 that he understood he  was not permitted to give personal references and that he
> would only give the LAS official reference ( position and dates of employment.)...

On March 31, 2023 at 1:22 PM GC- Rosenberg sent the Plaintiff an email, cc'ing CEO Carter,

**this email is one of many continuous and concerted emails to the Plaintiff that was**

**permeated with discriminatory intimidation, misogyny, sexism, ridicule, insult, humiliation**

**and psychological abuse creating a Hostile Work Environment for the Plaintiff.**  The email

stated in pertinent part;

> "Subject: Re: CONFIDENTIAL: NOTIFICATION of Breach of the ["CBA section 3.4.4.4.
> agreement"]
> **As I have explained to you on several occasions, we disagree with your**
> **characterizations         below.  We will not agree to amend the [CBA section 3.4.4.4.**
> **agreement]."**

On March 31, 2023 at 1:22 PM the Plaintiff sent GC- Rosenberg an email, cc'ing CEO Carter,
stating in pertinent part;

> "Scott,The emails speak for themselves as evidence. What "characterizations" are you not
> agreeing to?Are you saying that when I place in writing multiple times that an LAS employee
> does not have my permission to give a personal reference, and when that employee
> acknowledges in writing several times that they understand that they do not have permission
> to give a personal reference that they can give a personal reference regardless and then in
> addition not disclose to me exactly what they said ?"

Scott you were on all the email correspondence why didnt you tell [SMO] that if he got a call from [prospective employer] to not return the call or not answer the phone and immediately and to tell you and me about it so we could discuss how to handle it more ?...

**[SMO] acted unreasonable and continues his pattern of harassing disparate behavior of me.**

Twyla, I would like to discuss this matter with you. I do not know what [SMO] stated and from what I can piece together from my other two references [SMO] was the last person to be called. **Additionally you may not be aware that [SMO] has been investigated 2 times in relation to his inappropriate behavior towards me in EEO related matters. I am COMPLETELY CREEPED out that he would speak to anyone in a professional setting about me.** He has motive to have conducted himself in manner and or words that sabotaged my application with [prospective employer] and his refusal to disclose what he said and when the call was made and his avoidance of letting me and Scott promptly know that [prospective employer] left a message and then that the call occurred is presumptive interference with my efforts to obtain new employment... This is a very serious matter..."

Neither GC-Rosenberg or CEO Carter responded to the Plaintiff's email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

81. On March 31, 2023 at 9:38 pm the Plaintiff received an email from the [prospective employer] Bureau Chief stating in pertinent part;

"Good evening [Plaintiff],
Thank you so much for your interest and follow up email! I apologize for the wait! Unfortunately at this time, [prospective employer] is no longer hiring two management attorneys so the position is not available. We had a lot of interest in the staff attorney position, so we hired additional staff there instead. Should a supervisory position become available in the future, I would be happy to reach out. Thank you again!
Have a great weekend!"

The Bureau Chief's statement that the prospective employer decided to abandon the position turned out to be inaccurate (the Plaintiff is not making any claim that the Bureau Chief knew it was inaccurate). The prospective employer continued to post the Supervisory Family Court position on Indeed through June 2023.

82. After receiving this email the Plaintiff immediately sent an application through Indeed for a Felony positions the prospective employer had posted on INDEED for their criminal defense division.

**April 1, 2023**

83. On April 1, 2023 at 7:44am the Plaintiff sent GC- Rosenberg an email, cc'ing CEO Carter, stating in pertinent part;

> " Subject: Update Re: CONFIDENTIAL: NOTIFICATION of Breach ["CBA section 3.4.4.4. agreement"]
> Good morning Twyla & Scott,
> I received notification yesterday evening from the [prospective employer] bureau chief that I did not get the position.Please read the email statements of [SMO] that I provided you both yesterday. [SMO's] statements demonstrate hostility and unwillingness to be cooperative with me in the matter....
> Under  circumstances where [SMO] is being hostile and uncooperative it is not reasonable to expect the attitude he expressed towards me in the emails did not come through in his words and tone on the [prospective employer] call.
> Scott was on the emails and did not take steps to avoid a situation where no one knows exactly what [SMO] said or his tone on the [prospective employer] call.
> The evidence is very clear that [SMO] violated the contract as he had no permission to give a personal reference to [prospective employer], and the predictable/ pre warned akwardness on the call does not operate to lawfully over ride the breach. Please negotiate with me in good faith to cure the very detrimental effects the breach has caused me."

Neither GC-Rosenberg or CEO Carter responded to the Plaintiff's email. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

84. On Saturday, April 1, 2023 at 2:51pm less than 24 hours after the Plaintiff submitted her application she received a notification from INDEED that the prospective employer rejected her application for the position in the criminal defense division outright. This was a very hostile action for the prospective employer to take and it was designed to convey a message of his contempt towards the Plaintiff and the Plaintiff reasonably interpreted it as such.  INDEED does not require an employer to take any action on applications submitted through INDEED. Applications that an employer is not interested will in sit until in the INDEED system until they are purged from the system.

85. On April 1, 2023 at 4:01pm the Plaintiff sent an email to [prospective employer], stating in

pertinent part;

> "Hello…,I received the enclosed message from Indeed…that [prospective employment] is not
> moving forward with my application for Felony Staff attorney position.
> I am confused by this message, and its timing in relation to my submission of the application
> yesterday. I respectfully request any information you could provide. I was under the
> impression that my interviews with you and [bureau chief] went well , and two of my references
> ([Supervisor #3] and Judge) said those calls went well too. I have not had a chance yet to
> connect with [SMO] about your call with him, except for an email to me stating you connected
> with him. Again, I greatly appreciate any insight and guidance you could provide in this
> matter."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

**April 5, 2023**

86. On April 5, 2023 10:51 am the Plaintiff sent an email to GC Rosenberg and CEO Carter

stating in pertinent part;

> "**Subject:** Further update RE: Update Re: CONFIDENTIAL: NOTIFICATION of Breach
> of ["CBA section 3.4.4.4. agreement"]
> Good morning Twyla & Scott
> I am writing with an additional update… It is my intention at this time to discuss and work
> this matter out with the both of you in an reasonable and fair amendment to our ["CBA section
> 3.4.4.4. agreement"],
> That being said I am now notifying both of you that after receiving the regret correspondence
> for the [prospective employer] position I submitted the application to [prospective employer]
> for felony position. The next day, a Saturday, I received a notification from indeed that
> [prospective employer] took immediate action and is not moving forward with my felony
> application. See enclosed. I immediately wrote to [prospective employer] to inquire if this was
> an error and if not I would appreciate some insight as to why I my application was closed so
> quickly. I have not heard back so it is reasonable to conclude it was not an error.
> This aggressive action taken by [prospective employer] with regard to my felony application is
> a dramatic departure from his interest in offering me employment at the two interviews and
> the two reference calls with my references that I listed.[SMO] was the last person to speak to
> [prospective employer] and after that point [prospective employer's] previous interest to offer
> me employment at [prospective employment]dramatically changed.
>  For all the reasons and evidence I have presented to you both [SMO's] actions breached our
> separation agreement and has caused great damage to me…"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**April 10, 2023**

87. On April 10, 2023 at 9:16am the Plaintiff sent an email to GC Rosenberg and CEO Carter stating in pertinent part;

"Good morning,I hope everyone had a nice holiday and vacation.
I am requesting that we can set up a call or video conference today or tomorrow to discuss the unauthorized [prospective employment] personal reference given by [SMO] and the resulting fallout for me, and to additionally figure out concrete ways going forward to avoid problematic situations relating to references in the future should [SMO or CDP-AIC] be contacted…."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

88. On information and belief, source of that belief being statements made by the Prospective Employer in LAS Position statement to the EEOC, after receiving the Plaintiff's email GC Rosenberg contacted Prospective Employer the same day. GC Rosenberg conducted a leading inquiry designed to elicit non incriminating statements, ( ie., prospective employer stating  that SMO "had nothing negative to say" about the Plaintiff, SMO's statements were "entirely benign" and their conversation had "nothing to do with his decision not to hire" the Plaintiff.")  GC Rosenberg did not inquire further for information that would credibly resolve the central issues being debated between the Plaintiff and GC Rosenberg – Did SMO interfere with the Plaintiff getting the position, and did SMO make disparaging statements about the Plaintiff ?  Without knowing what the prospective employer had to say about the specific statements of SMO, details about the date and time of SMO communications to Prospective Employer, how they came to be, the reasons the prospective employer did not go forward with offering the Plaintiff employment for the position she applied for and why he rejected her subsequent application for another position outright, the central issues could not be credibly resolved.

89. On April 10, 2023 at 2:09pm GC Rosenberg the Plaintiff an email, cc'ing CEO Carter, **this email is one of many continuous and concerted emails to the Plaintiff that was permeated with discriminatory intimidation, ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.** The email stated in pertinent part;

> "Hi [Plaintiff],
> I am very sorry you did not get the position you sought. Twyla and I have conferred about your e-mails below. **[SMO] did not violate the separation agreement by making some brief, favorable comments about your work at LAS in a personal capacity. As you know, at your request, the agreement did not prohibit staff from making recommendations in their personal capacities. <u>Whether [SMO] failed to heed your instruction about a personal recommendation by making those favorable comments is a separate question.</u> It was not, however, a violation of the agreement. Nor were [SMO's] favorable comments about your work the cause of you not being offered the position.**" I wish you luck in finding a new position. We are not prepared to accept your invitation to modify the separation agreement. However, you may continue to ask LAS staff for recommendations in their personal capacities to the extent you may find that helpful."

On April 10, 2023 at 2:22 pm the plaintiff sent CG Rosenberg and CEO Carter an email stating in pertinent part;
> "The contract requires that LAS not interfere with my efforts to obtain new employment and it requires that NOTHING further then a date of employment and position held be provided. [SMO] violated the contract in these two respects. Please provide me with exactly what [SMO] said to [prospective employer] and how many times he spoke to him."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

90. After receiving the emails of GC Rosenberg on April 10, 2023 the Plaintiff placed a telephone call to prospective employer at 2:20pm and had a 17 minute conversation with him about his call with SMO regarding her application. Prospective employer spoke in an agitated tone from the inception of the call and raised his voice repeatedly throughout the call and eventually hung up on the Plaintiff when the Plaintiff asked him if he contacted her third reference Supervisor #2. Despite this, prospective employer did provide the Plaintiff with responses to many of her questions. However, throughout the Plaintiff's questions, prospective employer would interrupt the Plaintiff and gratuitously declare "[SMO] had nothing to do with

his decision not to offer the Plaintiff employment." The Plaintiff repeatedly responded that her

focus is on obtaining information on what [SMO] said to him about her. The prospective

employer did not offer any reason to the Plaintiff as to why he did not go forward with offering

her the position other than to again gratuitously state *"I am the leader of this office and do not*

*need to explain of justify my decisions to not hire someone to you or anyone else."*.

Plaintiff obtained the Verizon certified phone records of this call and has provided them to the

defendant, as such they are incorporated herein by reference.

91. Immediately after concluding the call with Prospective Employer the Plaintiff sent an email

on April 10, 2023 at 2:57pm recapping their telephone conversation as follows;

> "Hello [Prospective Employer]
> Thank you for taking my call moments ago and discussing your call with [SMO] regarding
>  my application at [prospective employment] for the family court position.
> Please confirm that your recollection (as per your representations on our call) was that
> [SMO] stated during your call with him,
> 1.  that I worked in the [CDP-BO#1] Office as a trial staff attorney,
> 2. he did not represent to you on that call that pursuant to LAS policy he could only provide
> that information and then went on to state unprompted by you,
> 2. that did not have a lot of interaction with me nor did he supervise me while I was as the
> [CDP-BO#1] office,
> 3. he stated that I did Criminal Trials and that he did not recall or state that I did family
> court work while in [CDP-BO#1],
> 4. he that stated that he thought I transferred to the [CDP-BO#2] office to be closer to
> home.
> Please also confirm that you represented to me on the telephone that your impression was
> that he did not recollect me very well and could not address any qualities about me in terms
> that could be understood as a favorable endorsement and that your characterization of the
> call was that the conversation with [SMO] benign in reference to what he represented about
> me. Please confirm the above account of our conversation moments ago or add any changes
> based on your recollection of the conversation.
> Thank you for giving this matter your prompt attention."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

92. On April 10, 2023 at 3:12pm the Plaintiff continued her email communications with GC

Rosenberg and CEO Carter stating in pertinent part;

> "Scott & Twyla
> To the contrary the separation agreement prohibits LAS from
> 1. making any statements about me to prospective employers other than my dates of
> employment or positions held.
> 2. making and disparaging statements about me to prospective employers
> 3.interfering with my efforts to obtain prospective employment
> Personal References have to be authorized by me and they can not be done on LAS phone
> lines or email. (those are your words that I have in writing several times).
> You have failed numerous times, upon my reasonable requests to disclose what exactly
> [SMO] stated to [prospective employer]. Stating that it is "favorable" is subjective and does
> not meet the contractual agreements outlined above.
> Please provide me with the date and time of the [SMO-Prospective employer] call.
> Please provide me with exactly what was said on the call…"

On April 10, at 3:54pm GC Rosenberg , cc'ing CEO Carter replied to the Plaintiff in an email

**, this email is one of many continuous and concerted emails to the Plaintiff that was**

**permeated with discriminatory intimidation, , ridicule, insult, humiliation and**

**psychological abuse creating a Hostile Work Environment for the Plaintiff.** The email stated

in pertinent part;

> "[SMO] spoke to [prospective employer] one time, for about three minutes. In sum and
> substance, **speaking in a personal capacity**, he said that the office was in need of an
> experienced attorney; you were a senior attorney who immediately fulfilled that need. He
> also told [prospective employer] that an IDV attorney went out on medical leave at the time,
> and you successfully stepped in, so much so that judge in the IDV part wanted you to stay
> permanently. **These were both favorable comments, stated in a personal
> capacity. [prospective employer] told [SMO] he was aware of some "red
> flags." [SMO] responded simply by repeating that you stepped in to fulfill an
> important need that the office had at the time. [SMO] clearly did not interfere with
> your efforts to obtain new employment. To the contrary, acting in a personal
> capacity, he assisted you. I am sorry you did not get the position, but it was not
> because of anything [SMO] said during this brief call, which was only helpful to
> you."**

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

93. On April 10, 2023 at 4:12pm the Plaintiff replied to GC Rosenberg and CEO Carter in an
email stating in pertinent part;

> "Scott & Twyla
> Thank you for that information as a start. Please answer the following relevant questions;
> Other than [SMO] account of what he said on the call to [prospective employer] do you
> have any other evidence of what was said on the call?
> ie., did he tape it or memorialize it in an email to you right after the call?
> What was the date and time of the call?
> When did you first learn about the call?
> Did [prospective employer] leave [SMO] a message and then [SMO] called him back? How
> did that 3 minute call come to be?
> **This is very serious and we should try to resolve it amongst ourselves and avoid
> going into court where the discovery process will reveal too many unpleasant matters
> and ways I was treated by [SMO] during my time at LAS."**

On April 10, 2023 at 4:18pm the Plaintiff continued her email communications with GC
Rosenberg and CEO Carter stating;

> "Adding to the email I just sent you both.
> I just realized below that Scott wrote "[prospective employer] told [SMO] he was aware of
> some "red flags."
> Scott are you saying that "[prospective employer] was providing information to [SMO] that
> he , ..., was aware of "red flags"or is that a typo and Scott you meant to write "[prospective
> employer] asked [SMO] if he [SMO] was aware of red flags. Please clarify this."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

94. On April 10, at 4:26 pm GC Rosenberg, cc'ing CEO Carter replied to the Plaintiff in an email

stating that the prospective employer told SMO he had concerns about the Plaintiff's application

because he knew "red flags" with it. This was a dishonest statement by SMO because the

confirmed that in writing with prospective employer on April 11, 2023 that "he knew of no red

flags" with the Plaintiff's application. **This email is one of many continuous and concerted**

**emails to the Plaintiff that was permeated with discriminatory intimidation, ridicule, insult,**

**humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.**

The email stated in pertinent part;

> "I have already informed you about the approximate date of the call; the exact time is
> immaterial. It was not memorialized or recorded. There are no typos in my e-mail. **As I**

**stated, [prospective employer] told [SMO] he [prospective employer] was aware of some "red flags." [Prospective Employer] had concerns about your application before he spoke to [SMO]. He was evidently inviting [SMO] to comment on them. [SMO] declined to do so. Instead, [SMO] simply repeated the positive responses about your work that he gave earlier."**

On April 10, 2023 at 4:47pm the Plaintiff continued her email communications with GC Rosenberg and CEO Carter stating;

"Scott, When did you learn that [prospective employer] told [SMO] that he "[prospective employer" was aware of some "red flags" with my application?...

TWYLA does it make sense to you that [prospective employer] would call a Supreme Court Judge and another reference of mine and represent to them he was very impressed with me and that he was very interested in offering me the position if he was aware of "red flags" ?...

**I have ample evidence to sustain a claim that [SMO] violated the contract and evidence to support that his version of the call is not accurate."**

The Plaintiff The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

95. The Plaintiff was extremely upset by the emails of GC Rosenberg and sent an email on April 10, 2023 at 5:16 pm to the prospective employer stating in pertinent part;

"Hello again [prospective employer]

I respectfully request that you confirm that the email below represents the sum and substance of your call with [SMO] about my ... family court application. Please understand that it is reasonably a concern of mine what others say about me in professional references relating to applications for employment. This is information that I am requesting so I can guide myself in future reference matters. While I respect that [SMO] is entitled to be benign in a reference communication please understand I need to confirm that that is all your call with him amounted to.

Please confirm that my email below is the sum and substance of your call with [SMO] regarding my ... Family Court application.

Thank you for your prompt attention to this matter."

96. On April 10, at 5:29 pm GC Rosenberg, cc'ing CEO Carter replied to the Plaintiff 4:47pm email, **this email is one of many continuous and concerted emails to the Plaintiff that was permeated with discriminatory intimidation, misogyny, sexism, ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.** The email stated in pertinent part;

" I would encourage you to think about how best to explore other job opportunities. To the extent our staff can give favorable recommendations in their personal capacities, you are welcome to ask them to do so. **If I may offer a personal opinion, litigating over compliance with the [CBA section 3.4.4.4. agreement], or over whether a prospective employer or others "slandered you," should not be on your list of strategies that are best designed to secure new employment."**

On April 10, 2023 at 5:52 pm the Plaintiff continued her email communications with GC

Rosenberg and CEO Carter stating in pertinent part;

"If LAS and [SMO] are operating to interfere with my efforts to obtain employment , and professionally disparage me and you and Twlya do not act to investigate that and take corrective action then I have no choice to bring a breach and other related civil claims as great damage to my livelihood will result by your inaction. [SMO] did not have to call [prospective employer] back…"

On Mon, Apr 10, 2023 at 6:29 pm GC Rosenberg , cc'ing CEO Carter sent the Plaintiff an

email **this email is one of many continuous and concerted emails to the Plaintiff that was**

**permeated with discriminatory intimidation, misogyny, sexism, ridicule, insult, humiliation**

**and psychological abuse creating a Hostile Work Environment for the Plaintiff.** The email

stated in pertinent part;

**"As I have explained, LAS and [SMO] are not interfering with your efforts to obtain new employment, nor has any LAS manager disparaged you. There is no action we have taken that could be, or needs to be, "corrected."…"**

On April 10, 2023 at 7:10pm the Plaintiff continued her email communications with GC
Rosenberg and CEO Carter stating in pertinent part;

"Scott,Are you stating that as the [CBA section 3.4.4.4. agreement] currently reads that [SMO], [CDP-AIC] or any other LAS employee can take a call from a prospective employer and after giving the official reference then can say now I am giving  a personal reference without my prior written request or permission for them to do so?
So for instance on such a call made to them in their LAS official capacity they can state that they can only give my dates of employment and current position in an official capacity but then further state that in their personal capacity they think this or that of me, regardless if I gave them permission? Please answer …
**You have enough evidence to consider [SMO] violated the agreement and interfered with my efforts to obtain new employment at the reference stage of the application. It is not in your or my best interest for me to reveal the other evidence that I have."**

GC Rosenberg did not answer the Plaintiff's questions. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

97. On April 10, 2023 at 9:46pm the Plaintiff sent a followup email to prospective employer on the same email thread she started on April 10, 2023 at 2:57pm, therein stating the following;

> " Hello …
> I have received two emails from Scott Rosenberg, LAS General Counsel, concerning the contents of the call you had with [SMO] regarding my … Family Court application.
> Therein  Rosenberg states that [SMO] said you told him you had concerns about my application and that you had information that there are "red flags." Rosenberg goes on to state that [SMO] declined to comment and repeated his former two statements contained in the emails.
> Please clarify this matter as it has great impact on my professional reputation.
> DID you state that you have information of "red flags" about me and if so please tell me what it is so I can clear that mis-information up with whomever stated that to you?
> You spoke with my current supervisor and a … Supreme Court Judge about me , both of which gave you glowing references of me and both of which were not presented with any such statement by you about having "red flags" about me from some other source.
> My inquiry herein is not focused on your thought process on not offering me employment, it is focused on inaccurate and damaging statements that are being made about my professional reputation and my reasonable objective to correct whomever is stating them.
> Please answer my reasonable inquiry in this and the email below.
> Thank you"

Prospective Employer did not answer the Plaintiff's questions on April 10, 2023. The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

## April 11, 2023

98. On April 11, 2023 the Plaintiff and prospective employer had a series of email communications. On April 11, 2023 at 10:57am the Plaintiff sent prospective employer a follow up email from the email thread she started on April 10, 2023 at 2:57pm the prior day stating;

> "Hello …,
> I am following up on my correspondence to you yesterday.
> Please clarify as to whether you stated to [SMO] that you have information that there are "red flags" with my application.

My other two references told me that you inquired if they knew of any "red flags" with my application, to which they both said "no". It is completely logical that you would ask the former in a reference inquiry and I have no issue with that.

However as you see from General Counsel's email to me [SMO] <u>is stating that you said to him that you had information that there are "red flags" with my application. You can understand that it is an issue of great concern to me if you represented that you had such information and that I would  need to correct that with the source of your information.</u>

It seems to me that you did not state that you had information that there were "red flags" and [SMO] heard it wrong but I need to make sure that is the case.

Please clarify, this is causing me anxiety and great concern. Thank you"

On Tue, Apr 11, 2023 at 11:07  in response to the Plaintiff's original email requesting confirmation of her recitation of his March 15, 2023 call with SMO the  prospective employer responded on the same email thread that the Plaintiff started on April 10, 2023 at 2:57pm stating;

"[Plaintiff]
I have nothing to add
I wish you the very best
            [prospective employer]

On April 11, 2023 at 11:27 am the Plaintiff sent Prospective Employer a follow up email from the email thread she started on April 10, 2023 at 2:57pm the prior day stating;

"Hello
Thank you for your response, however I need an answer to the inquiry I am making of you.
It is my sincerest hope that you and I can conclude this matter between us with your reply to my reasonable inquiry about a serious matters relating to my professional reputation.
Please clarify as to whether you stated to [SMO] on the reference call for the …Family Court application that
a. you had information that there are "red flags" with my application prior to calling him,
or
b. if you inquired (consistent with what the other two references reported ) if he knew of any "red flags"
or
c.none of the above was discussed on the call."

On Tue, Apr 11, 2023 at 11:31 am prospective employer sent a reply email on the same thread the Plaintiff started on April 10, 2023 at 2:57pm stating;

**<u>"I believe I asked were there any red flags because I had no knowledge of any"</u>**

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**April 13 & 14 , 2023**

99. On April 13, 2023 at 7:28pm the Plaintiff sent GC-Rosenberg and CEO Carter an email with a second breach notice based on new evidence. The email stated in pertinent part;

> "TO: SCOTT ROSENBERG , General Counsel LAS
> TO: TWYLA CARTER, AIC , CEO LAS
> <u>Pursuant to paragraph #9 of the [ CBA section 3.4.4.4. Agreement]… I am writing to notify you of the following;</u>
> [i] as outlined in more detail below, in addition to prior notification of a breaches of section (1) (g) & 1(h) by LAS there is an additional breach of paragraph #7 (b) by LAS, and
> [ii] new evidence has been obtained by [Plaintiff], in addition to previously submitted evidence, to support the breaches of said sections, and is attached and outlined below;…
> <u>Pursuant to paragraph #9 of the [CBA section 3.4.4.4. Agreement]…, I am writing to seek the following amendment as remedies for the specified breaches</u> <u>on the grounds that significant damage was caused to me by LAS *via* [SMO] making unfavorable, false, disparaging and maligning statements to [prospective employer], which interfered with my efforts to obtain new employment at [prospective employment] resulting in the loss of the specified position and any future prospects of obtaining employment at [prospective employment], and interfering by jeopardizing my prospects of obtaining employment with any of the providers that are members of the [legal organization] LAS has no control over what [prospective employer] , an active member of the [legal organization] with industry contacts and work related duties with numerous providers, may repeat to others about the statements [SMO] made to him about me…</u>
>
> [ii] amendment to paragraph (1) (h) to read:
> "… Should a future employer contact [SMO] regarding Conroy's employment he is to address the matter in the strict accordance with the following;
>  [a] if the contact is via message on his work or private phones, or via e-mail to his work or private email, he is to immediately notify general counsel via email and cc [Plaintiff] of the date, time, name and contact information of the caller and [SMO] is to strictly refrain from any communication with the caller.
> [b] if the contact is *in person* or as the result of answering a call, [SMO] is to state that he is not authorized to provide the requested information and refer the caller to General Counsel's email *(or whomever email Scott wants to designate in this amendment)*. [SMO] is to immediately notify general counsel via email and cc [Plaintiff] of the date, time, name and contact information of the caller and [SMO] is to strictly refrain from any further communication with the caller…."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

100.  On April 14, 2023 at 5:08 pm Scott Rosenberg , cc'ing CEO Carter sent the Plaintiff an email, **this email is one of many continuous and concerted emails to the Plaintiff that was permeated with discriminatory intimidation, ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.  This email also included Retaliatory threats to limit the Plaintiff's contractual benefits of employment to seek personal capacity references from, Supervisor #3 & #4 who were two of the seven people mentioned in the agreement, and who had been providing and agreeing to provide personal capacity references for the Plaintiff .** The email stated in pertinent part;

> "As I have stated previously, no one at LAS violated the **[CBA section 3.4.4.4. Agreement]**.  We will not agree to modify the **[CBA section 3.4.4.4. Agreement]**.  If you so desire, **I will instruct the seven persons who are mentioned in the agreement that if they are contacted in the future concerning your employment, they are not permitted to make any personal reference on your behalf.**  They will instead refer the caller to the Chief Human Resources Officer, who will provide your job title and dates of employment."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

## RETALIATION BY LAS FOR PLAINTIFF'S APRIL 21, 2023 EMAIL COMPLAINING ABOUT SMO'S QUID PRO QUO SEXUAL HARASSMENT

### April 21, 2023

101. The Plaintiff sent GC Rosenberg and CEO Carter an email on April 21, 2023 at 1:24 pm that stated in pertinent part;

> "...Scott you were on all the emails with [SMO] and me and you took no steps to avoid this situation and tell [SMO] that he is not permitted to return or take the call and to refer [prospective employer] directly to you.
>
> **Furthermore, your failure to now direct [SMO], and memorialize it in our contract as an amendment that he is not permitted to speak to anyone about me and he must refer any future callers immediately to you is creating an EEO sexual harassment claims against LAS.**
>
> ie., because I refused to respond to [SMO] in this matter in the historical ways, he demands of me "female damsel in distress" or  "female massaging his ego that he is such a powerful man that only he alone could land me the job"

he retaliated by disparaging me and lying about me not having worked in IDV on the [prospective employer] call and he is declaring that he do this so this again if I don't respond to him in the historical ways he has always demanded.

**I WAS AND HAVE ALWAYS BEEN SEXUALLY HARASSED BY [SMO].** You have investigated him at least two times that I know of concerning his obsession and focus on me and the appearance of impropriety that he caused too many employees in this organization to have about the nature of his relationship with me.
**LAS is knowingly permitting [SMO] to continue sexually harass me in how it handled this [prospective employer] call matter and how it continues to handle the continued matter of [SMO] in relation to my job search and efforts. I am not meeting his disgusting demands anymore in fear of his retaliation so this is going to get worse for me if he is not stopped!**

You both should be reasonable and do the legal calculations in this matter. **You must protect me and my reputation and employment efforts from [SMO's] retaliation for my rejection of his disgusting demands of me.**

My amendment proposal my April 13, 2023  2nd Breach notice should be immediately accepted by you. And you both should be supportive in my daily efforts to obtain new employment without the stress and distraction of fear of [SMO].

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

**April 24, 2023**

102. On Mon, Apr 24, 2023 at 6:15 PM Scott Rosenberg sent the Plaintiff an email with an official LAS letter attached **this email and the attached letter is one of many continuous and concerted emails to the Plaintiff that was permeated with discriminatory intimidation, misogyny, sexism, ridicule, insult, humiliation and psychological abuse creating a Hostile Work Environment for the Plaintiff.  This letter also constituted retaliation for the discrimination complaints the Plaintiff made against SMO in her April 21, 2025 email**. With no legitimate and non retaliatory reason to do so, GC Rosenberg took a material adverse work action against the Plaintiff by altering her contracted employment right/benefit to be the sole

68

authority of permitting "personal capacity" references of LAS staff to prospective employers.

The email stated in pertinent part;

The email stated;

> "[Plaintiff]
> Please see the attached letter."

The letter states in pertinent part;
> "Dear [Plaintiff]
> This letter is written in response to the various e-mails you have sent since my last communication to you. As I have previously explained, The Legal Aid Society did not violate the **[CBA section 3.4.4.4. Agreement]** … The sole provision regarding references in the Agreement states: "If a future employer contacts LAS regarding [Plaintiff's] employment, LAS will provide that employer with a neutral reference, which includes only [Plaintiff's] name, positions held, and dates of employment and nothing further." LAS has, at all times, complied with this provision. As you know, the Agreement is silent with respect to personal references any LAS employee might provide, but our practice is to permit any employee to speak in his or her personal capacity.
> Further, in prior communications, you explicitly agreed that the Agreement does not prohibit making references in a personal capacity. **The brief comments made by [SMO], in a personal capacity, to [prospective employer] did not violate the Agreement.**
> In view of the above, we cannot agree to modify the Agreement. **[SMO] and [CDP-AIC] will not be responding directly to your e-mails, although I can assure you that if contacted by a prospective employer, they will provide only your job title and dates of employment.**
> I will not be communicating with you further about this. We consider that matter closed.
> Best regards,
> Scott A. Rosenberg
> General Counsel"

On Mon, Apr 24, 2023 at 6:56 pm the Plaintiff sent an email to GC Rosenberg and CEO Carter stating the following;
> "Hello Scott and Twyla
> I received your enclosed letter. The matter is not closed and this response is legally incorrect. [SMO] did not give a "personal reference" on the … mid-March call, rather he spoke in a"personal capacity" and the content of his statements violated the **[CBA section 3.4.4.4. Agreement]**in that
> a. they exceeded the "nothing further" clause (1) (h)
> b. they interfered with my efforts to get employment, and disparaged me, because they disparage me by not answering there are "no red flags" and that I did not work in IDV when I was in [CDP -BO#1] making statements on my resume and at the interview appear false. (1) g) & 7(b).
> **[SMO's] actions in returning and on the [prospective employer] call constituted sexual harassment.**

> **LAS actions (via general counsel failing to act) constituted participation and facilitation of sexual harassment against me under circumstances where LAS knows and has investigated [SMO] for sexual harassment related EEO investigations and made conclusions and finding against him. LAS failure to amend the agreement and prohibit [SMO] and [CDP-AIC] from giving any information about me constitutes continued sexual harassment and facilitation of sexual harassment. I** have referred this matter to ALAA . You will be hearing from me one way or another very shortly."

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

103. ALAA took up the Plaintiff's cause but got nowhere with LAS and ultimately suggested the Plaintiff take the matter up with the EEOC.

## FEBRUARY 22, 2024 POST-EMPLOYMENT RETALIATION FOR FILING EEOC CHARGES

104. December 22, 2023 the Plaintiff filed her charges with the EEOC. On February 22, 2024 the Plaintiff received the LAS Position statement which included an affidavit from SMO. Therein SMO referred to and attached confidential and withdrawn employment documents in the Plaintiff's LAS employment file. These documents were provided to SMO by GC Rosenberg in hard copy and digital format with a representation that they were still viable. SMO made false statements in his affidavit accordingly.

105. These documents are completely separate from the **CBA section 3.4.4.4. Agreement** and they are not annexed to it. The only extent they are related to the **CBA section 3.4.4.4. Agreement** is a provision that states they are withdrawn by LAS, and a provision that states they are confidential. Pursuant to section (6), and (11) of the CBA section 3.4.4.4. , Agreement LAS is prohibited from disclosing them to SMO and to the EEOC.

106. GC Rosenberg's actions of providing these documents to SMO constitutes a breach of the agreement and a material adverse action. GC Rosenberg had no legitimate and non retaliatory reason to disclose and provide the confidential and withdrawn documents to SMO.

70

107. On February 22, 2024 the Plaintiff sent an email to GC-Rosenberg, SMO and CEO Carter

notifying them of a contract breach. The email stated the following in pertinent part;

> "I am notifying you of a contract breach. Today I received an affidavit from [SMO]
> submitted to the EEOC. ...There was no legitimate reason for LAS (Scott) to provide
> [SMO] with my confidential documents for his affidavit... [SMO] and LAS this constitutes
> very clear notice that you have no legal right or permission from me to disseminate those
> documents...Twyla please acknowledge your compliance to so direct Scott and [SMO]with
> this notice."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

**February 26, 2024**

108. On February 26, 2024 at 11:11am GC Rosenberg, cc'ing SMO and CEO Carter sent an

email to the Plaintiff stating the following in pertinent part;

> "I am in receipt of your email below, which is without legal basis. Your EEOC charge
> alleges that [SMO] violated the**[CBA section 3.4.4.4. Agreement].** Clearly, [SMO] is
> permitted to read the agreement you are alleging he violated... In Section 5(b), the
> agreement allows the disclosure of this confidential information to the EEOC, and therefore
> to [SMO], since [SMO] is clearly allowed to read his own position statement. Further, the
> information ... is directly pertinent to his defense. Your position that [SMO] is not
> permitted to know information directly pertinent to his own defense, and explicitly
> authorized by the agreement, is meritless."

The defendant has possession of the written documents referred to in this paragraph, as such

they are incorporated herein by reference.

109. The Plaintiff's email from February 22, 2023 did ^not^ state that GC Rosenberg provided SMO

with the CBA section 3.4.4.4. , Agreement. SMO's affidavit neither mentions the CBA section

3.4.4.4. , Agreement, nor does it attach it to his affidavit. GC-Rosenberg however states that he let

SMO read the CBA section 3.4.4.4. , Agreement . This is a breach of the agreement and a material

adverse action with no legitimate and non retaliatory purpose because Pursuant to section 5 (b) of

the CBA section 3.4.4.4. , Agreement  LAS,  the Plaintiff and, ALAA  can disclose the otherwise

confidential CBA section 3.4.4.4. , Agreement  only to a governmental agency or regulatory body,

SMO is neither. Pursuant to sections 5 (c), (6), (11) of the CBA section 3.4.4.4. , Agreement LAS was prohibited from letting SMO read the agreement.

110. GC Rosenberg incorrectly states that SMO is entitled to the documents for "preparation of his defense". SMO was not then or now being sued individually. SMO had no defense to prepare for at the time GC Rosenberg gave him the confidential and withdrawn documents and let him read the confidential CBA section 3.4.4.4. , Agreement. The Plaintiff only filed charges pursuant to Title VII against The Legal Aid Society. She did not at that time or since file charges that would permit any individual liability claims against SMO or GC Rosenberg or any anticipation of individual liability against either of them.

111. On February 26, 2024 at 5:38 pm the Plaintiff responded to GC Rosenberg's email stating in pertinent part,

> "In response to your email dated February 26, 2024 I am notifying you that your response constitutes further breach of the  **[CBA section 3.4.4.4. Agreement]**in that among other things. Specifically,
> 1. You have violated the **[CBA section 3.4.4.4. Agreement]**in that by encouraging and facilitating [SMO] make false and maligning statements against me  in his "opposition statement" to my EEOC charges 520-2024-01117by providing  false information to him & preparing false statements in paragraphs # 6 & # 7  of his affidavit …
> 2. Section 5(g) does not lawfully permit you to disclose confidential documents to [SMO] for his opposition statement…
> My charges are specific to [SMO's] discriminatory actions
> [i] on a February 27, 2023 phone call between he and I,
> [ii] his discriminatory actions on March 1, 2023 with [Supervisor #2] in relation to my rejection of his sexual advances on the February 27, 2023 phone call, and
> [iii] his discriminatory actions on the phone call with [prospective employer] in relation to my rejection of his sexual advances on the February 27, 2023 phone call  (which was either the week of March 13, 2023 according to [SMO's] emails to you and me  and  according to [prospective employer's] March 10, 2023 email, or on March  27, 2023 according to [prospective employer's] affidavit).
> [SMO] was notified by me via email that he did not have my permission to give a personal capacity reference to [prospective employer] regarding my [prospective employment] application….
> …Pursuant to the terms of the **[CBA section 3.4.4.4. Agreement]**  there is no legitimate or lawful reason to support your disclosure of the aforementioned confidential documents to [SMO] under a claim that he needs them to prepare his defense on the charges as presented.

These documents were withdrawn and have no bearing on the **[CBA section 3.4.4.4. Agreement]** terms regarding the limits of official capacity references…"

The defendant has possession of the written documents referred to in this paragraph, as such they are incorporated herein by reference.

## NOTICE TO THE EEOC OF LAS VIOLATION OF TITLE VII ANTIRETALIATION PROVISION

112. On February 26, 2024 at 5:59pm the Plaintiff notified the EEOC, via email and cc'ing GC Rosenberg, CEO Carter, and SMO, of LAS retaliation against her for filing the charges with the EEOC, the email stated in pertinent part,

"Hello EEOC [EEOC representative assigned to the charges]
I have received LAS opposition statements and supporting affidavits with exhibits. I will promptly and formally respond including documentary evidence by way of email, text, and affidavit evidence in support of my claim and the various and many untruthful statements in the affidavits accompanying LAS opposition statement.
In the interim I am writing to notify you of Retaliation on the part of Scott Rosenberg & LAS Bd against me for filing the discrimination charges.
In the main  Rosenberg (General Counsel and a sitting member of the LAS Board)  have provided [SMO] confidential, withdrawn personal employment documents, and provided him with a false and incomplete narrative that these documents are still viable … This is patently false. Those documents are not viable pursuant to the **[CBA section 3.4.4.4. Agreement]**…
I am including below my notices to LAS, Rosenberg, [SMO] which object to LAS providing [SMO] with said documents under the claim of "preparation for defense" and to cease and desist from falsely repeating in any format …
Thank you for giving this matter your attention."

## In Conclusion

113. Despite Plaintiff's complaints, Defendant LAS had failed to take prompt and appropriate remedial action to prevent or correct discrimination and harassment.

114. Defendant LAS knew that Plaintiff was being subjected to sexual harassment, hostile work environment and retaliation and they condoned, supported, ratified, and furthered said discriminatory and hostile conduct.

115. Defendant LAS willingly ignored their obligations to prevent discrimination in the workplace - to the detriment of Plaintiff.

116. Despite Defendant LAS clear knowledge of the discriminatory actions against Plaintiff, Defendants did not make any effort to remedy the situation.

117. Defendant LAS actions and conduct were intentional, grossly negligent, and intended to harm Plaintiff. As a result, Plaintiff was unlawfully humiliated, degraded and belittled, suffered violations of her rights, suffered economic damages, reputation damages, emotional distress, experienced inconvenience, pain and suffering, humiliation, stress, anxiety, embarrassment, and was grossly and unnecessarily aggravated.

118. Defendant LAS conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. Punitive damages are warranted against the Defendant.

## AS A FIRST CAUSE OF ACTION
## QUID PRO QUO SEXUAL HARASSMENT
## DISCRIMINATION UNDER TITLE VII

119. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

120. This claim is authorized and instituted pursuant to the provisions of Title VII for relief based upon the unlawful employment practices of Defendant against Plaintiff because of her sex/gender (female).

121. Plaintiff complains the Defendant engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff on February 27, March 15, and 27 2023 with respect to the terms, conditions, privileges and benefits of her employment because of her rejection of unwanted sexual advances by a LAS Senior Management Official.

**AS A SECOND CAUSE OF ACTION**
**QUID PRO QUO SEXUAL HARASSMENT**
**DISCRIMINATION UNDER TITLE VII**

122. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

123. This claim is authorized and instituted pursuant to the provisions of Title VII for relief based upon the unlawful employment practices of Defendant against Plaintiff because of her sex/gender (female).

124. Plaintiff complains the Defendant Legal Aid Society of New York City engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff on March 1, and 15, 2023 with respect to the terms, conditions, privileges and benefits of her employment because of her rejection of unwanted sexual advances by a LAS Senior Management Official.

**AS A THIRD CAUSE OF ACTION**
**RETALIATION DISCRIMINATION**
**UNDER TITLE VII**

125.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

126. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

127. Defendant Legal Aid Society of New York City engaged in unlawful employment practice prohibited by Title VII by discriminating against Plaintiff on March 27, 2023 with respect to the terms, conditions or privileges of employment because of her engagement in protected activity opposing unlawful employment practices of the Defendant.

**AS A FOURTH CAUSE OF ACTION**
**HOSTILE WORK ENVIORNMENT**
**DISCRIMINATION UNDER TITLE VII**

128. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

129. This claim is authorized and instituted pursuant to the provisions of Title VII for relief based upon the unlawful employment practices of Defendant against Plaintiff because of her sex/gender (female).

130. Plaintiff complains the Defendant Legal Aid Society of New York City engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff between February 28 through April 24, 2023 with respect to the terms, conditions or privileges of her employment by engaging in a consistent and concerted course of conduct which was so severe and pervasive to alter the conditions of the Plaintiff's employment and create an abusive working environment.

**AS A FIFTH CAUSE OF ACTION**
**RETALIATION DISCRIMINATION**
**UNDER TITLE VII**

131. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

132. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

133. Defendant Legal Aid Society of New York engaged in unlawful employment practice prohibited by Title VII by discriminating against Plaintiff on April 24, 2023 with respect to the

terms, conditions or privileges of employment because of her opposition to the unlawful

employment practices of the Defendant.

### AS A SIXTH CAUSE OF ACTION
### POST-EMPLOMENT RETALIATION DISCRIMINATION
### UNDER TITLE VII

134. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

135. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that

it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any
> practice made an unlawful employment practice by this subchapter, or because [s]he has
> made a charge, testified, assisted or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

136. Defendant engaged in unlawful employment practice prohibited by Title VII by

discriminating against Plaintiff on February 21, 2024 by taking a materially adverse work action

because of her engagement in protected activity opposing unlawful employment practices of the

Defendant..

### **JURY DEMAND**

137. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practices prohibited by Title

VII against the Plaintiff on the basis of her gender/sex.

B. Awarding the Plaintiff compensatory damages for lost wages, injury to professional

reputation, loss of career advancement, severe aggravation and distress, phycological abuse, and

fear,

C. Awarding the Plaintiff punitive damages.

D. Awarding the Plaintiff, fees, costs and expenses incurred in the prosecution of this action; and

E. Awarding the Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful employment practices.

### Certification and Closing Under Federal Rule of Civil Procedure 11

By signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address or email address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: MARCh 24, 2025

Signature of Plaintiff Jane Doe Esq.

Printed Name of Plaintiff Jane Doe ESQ

Mailing Address:

Email Address :

Telephone number:

# EXHIBIT A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

New Orleans Field Office
500 Poydras Street, Suite809
New Orleans, LA 70130
(504) 635-2531
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/27/2024

To:

Charge No: 520-2024-01117

EEOC Representative and email:    HARLIS SION
Investigator
harlis.sion@eeoc.gov

___

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Michael Kirkland
12/27/2024
___
Michael Kirkland
Director

 Gmail 

---

**Document Added to EEOC Charge 520-2024-01117 / Documento Agregado a la Queja/Querella 520-2024-01117**

---

EEOC <no-reply@service.eeoc.gov>                    Mon, Dec 30, 2024 at 11:45 AM
To:

            **U.S. Equal Employment Opportunity Commission**

A new document was added to EEOC Charge No. 520-2024-01117,
THE LEGAL AID SOCIETY;. To view it, sign-in to the EEOC Public Portal.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact info@eeoc.gov and destroy all copies of the original message and attachments.*

Se ha agregado un nuevo documento a la queja/querella de la EEOC, número 520-2024-01117,                    . THE LEGAL AID SOCIETY;. Para verlo, inicie sesión en el Portal Público de la EEOC.

Este correo electrónico es una notificación oficial de la Comisión para la Igualdad de Oportunidades en el Empleo (EEOC, por sus siglas en inglés) con respecto a la queja/querella 520-2024-01117. Por favor, no responda a este correo electrónico.

*Aviso de confidencialidad: La información contenida en este correo electrónico puede contener información privilegiada y confidencial, incluida información protegida por las leyes de privacidad federales y estatales. Está destinada únicamente al uso de la(s) persona(s) nombrada(s) anteriormente. Si usted no es el(la) destinatario(a) previsto(a), se le notifica que cualquier revisión, difusión, distribución o duplicación de esta comunicación está estrictamente prohibida y puede ser ilegal. Si usted no es el(la) destinatario(a) previsto(a), póngase en contacto con nosotros en info@eeoc.gov y destruya todas las copias del mensaje original y los archivos adjuntos.*

**Cc:**

**Cc:**



Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

#### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

#### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

#### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2024-01117 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2024-01117 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# EXHIBIT  B

80

Date: December 22, 2023

To : Twyla Carter, CEO
       Scott Rosenberg, General Counsel

Via email at: tcarter@legal-aid.org

                    srosenberg@legal-aid.org

From: 

RE: Resignation


Please be advised that effective December 31, 2023 I am resigning from my
position as a senior felony staff attorney in the Legal Aid Society Criminal Defense
Division.

 Gmail

███████████████████████████

**RE: RESENDING Fwd:** ███████████████████████
1 message

**Twyla Carter** <tcarter@legal-aid.org>                    Tue, Mar 12, 2024 at 5:30 PM
███████████████████████████████
Cc: Scott Rosenberg <SRosenberg@legal-aid.org>

█████████████

I hope you're doing well. The letter is attached.


Best,
Twyla



Twyla Carter (she/her)

The Legal Aid Society

Attorney-in-Chief & Chief Executive Officer

199 Water Street

New York, NY 10038

212-577-3395

tcarter@legal-aid.org

www.legalaidnyc.org


**THE
LEGAL AID
SOCIETY**


The information in this email may be confidential or contain information protected by Federal and State Privacy laws. If you are not the intended recipient, any review or dissemination of the information contained in this message is prohibited by law. If you have received this email in error, please notify the sender and delete this email. Thank you.

# THE
# LEGAL AID
# SOCIETY

199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

Alan Levine
*President*

Zachary W. Carter
*Chairperson of the Board*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

March 12, 2024



To whom it may concern:

This letter will confirm that ███████████ was employed by The Legal Aid Society as a Staff Attorney in the Criminal Defense Practice from November 17, 2014 until December 31, 2023.  She maintained a high felony caseload and conducted many hearings and trials.

Best regards,

*Twyla Carter*

Twyla Carter
Chief Executive Officer and Attorney-in-Chief

**Justice in Every Borough.**

# THE LEGAL AID SOCIETY

199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

Alan Levine
*President*

Zachary W. Carter
*Chairperson of the Board*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

February 3, 2023



To whom it may concern:

This letter will confirm that ███████████ served as an attorney mentor in The Legal Aid Society law student internship program from the Spring of 2015 through the Fall of 2022.

Best regards,

Twyla Carter
Chief Executive Officer and Attorney-in-Chief

**Justice in Every Borough.**